**Beverly TSOMBANIDIS, Oxford House, Inc., and John Does One Through Eight (Current and Prospective Residents of 421 Platt Avenue, West Haven, Connecticut), Plaintiffs,**

v.

**CITY OF WEST HAVEN, CONNECTICUT, First Fire District of the City of West Haven, Defendants.**

**No. 3:98CV1316(GLG).**

United States District Court, D. Connecticut.

Jan. 30, 2001.

---

Jonathan B. Orleans, Sarah W. Poston, Zeldes, Needle & Cooper, Bridgeport, CT, Steven G. Polin, Washington, DC, for Beverly Tsombanidis, Oxford House, John Does.

Michael P. Farrell, Martin S. Echter, West Haven, CT for City of West Haven.

Thomas R. Gerarde, Melinda P. Frechette, Howd & Ludorf, Hartford, CT, for First Fire District of the City of West Haven.

## *OPINION*

GOETTEL, District Judge.

This matter arises from the imbrication of two federal civil rights statutes with Connecticut's Building and Fire Safety Codes in the context of a group home for recovering drug and alcohol abusers. Despite the altruistic purposes of these State codes, plaintiffs ask this Court to enjoin their enforcement in the name of protecting the rights of handicapped and disabled persons under the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq.* ("FHAA"), Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12165 ("ADA"), and the Equal Protection Clause, pursuant to 42 U.S.C. § 1983. Plaintiffs contend that defendants have violated these statutes by enforcing the State's Building and Fire Safety Codes in a discriminatory manner and in refusing to treat their group home as a single-family residence.

Pending before the Court are the motions for summary judgment of the City of West Haven [Doc. # 63] and the First Fire District of the West Haven Fire Department [Doc. # 44]. After due consideration of the extensive briefs submitted by the parties and after hearing oral argu-ment on the motions, the Court grants in part and denies in part defendants' motions for summary judgment for the reasons set forth below.

## I. BACKGROUND

### A. THE PARTIES

Plaintiff Oxford House, Inc., is a non-profit, tax-exempt, Delaware corporation that assists in the establishment of group homes for recovering alcoholics and drug addicts. Oxford House serves as the umbrella organization for a nationwide network of over 700 group homes in the United States, of which seven are located in or around New Haven, Connecticut. Each group home is autonomous, financially self-supporting, and democratically run. Oxford House maintains that this type of group home is a necessary part of the recovery process for addicts and enables them to remain sober and return to productive lives. According to Oxford House, "[f]inding and staying in a healthy, functional environment, surrounded by people who are not abusing alcohol or drugs, away from people and situations that previously triggered substance use, with access to transportation and work opportunities, are essential elements to avoiding relapse." (Pls.' Mem. at 8.) Oxford House residents frequently attend meetings of Alcoholics Anonymous and Narcotics Anonymous. Each house subscribes to the Oxford House mandate that requires the immediate expulsion of anyone who relapses into drug or alcohol use. "In sum, the Oxford House model is a highly successful and frequently replicated rehabilitative method." *Id.* at 9. (Defendants do not challenge the effectiveness of the Oxford House model, and that is not an issue before this Court.)

Plaintiff Beverly Tsombanidis is the owner of a residence located at 421 Platt Avenue, West Haven, Connecticut, known as "Oxford House–Jones Hill," the group home at issue in this case. Ms. Tsombanidis leases the house to an unincorporated

association known as Oxford House–Jones Hill, which is comprised of all residents in the group home, and, thus, the name for this group home.

Since August, 1997, Oxford House–Jones Hill has been occupied by an average of seven men, all of whom are recovering alcoholics and drug addicts. The residents are also plaintiffs in this action, referred to as "John Does One through Eight" and identified as "current or prospective residents of 421 Platt Avenue, [who] are all recovering alcoholics and substance abusers, and [who] are in need of housing and [who] are able to live in the community." (Pls.' Am.Compl. ¶ 5.)

Defendants are the City of West Haven, which enforces the City zoning ordinances (also known as the Land Use Regulations of the City of West Haven) and the State Building Code[1] over land and dwellings within its boundaries, and the First Fire District of the West Haven Fire Department, a political subdivision of the State, which enforces the State Fire Safety Code within West Haven.

## B. FACTS

### 1. The Establishment of Oxford House–Jones Hill

In July 1997, Ms. Tsombanidis purchased a single-family home located at 421 Platt Avenue, West Haven, Connecticut, for the purpose of creating a home for recovering alcoholics and substance abusers. The house is located within an R–2 residential zone of single-family detached residences. Ms. Tsombanidis had heard about the Oxford House concept at an outreach program in West Haven and contacted the president of the New Haven chapter, who told her how Oxford Houses were run. He suggested that seven residents would be the ideal number for this group home. He told her that she would

need to obtain two refrigerators, build two bathrooms, and install smoke detectors before the house could become operational as an Oxford House group home. Ms. Tsombanidis made numerous repairs and improvements to the house, including those suggested by Oxford House. On July 26, 1997, she signed a lease with Oxford House–Jones Hill, thus establishing 421 Platt Avenue as Oxford House–Jones Hill.

In August, 1997, the original John Does moved into 421 Platt Avenue. Collectively, the residents lease the entire house (as opposed to any particular room) and pay rent to the landlord in a single payment. There are no individual locks on the bedroom doors, thus making all rooms accessible to all residents. The residents share equally all household expenses, including rent, and all household chores, including cooking, shopping, and cleaning. The residents manage the house themselves and elect house officers, who run the weekly meetings at which household financial, logistical and interpersonal issues are discussed. Household safety, including fire safety, is also covered at these meetings. There is no house manager or paid professional staff, and the owner of the property is not involved in running the house.

The residents are allowed to remain indefinitely at the Oxford House group home, so long as they do not relapse into drug or alcohol use.

### 2. The Neighbors' Complaints to Ms. Tsombanidis

Shortly after the first residents moved into Oxford House–Jones Hill, neighbors began complaining to Ms. Tsombanidis about renting the house to recovering addicts. According to Ms. Tsombanidis, the neighbors' complaints occurred on an almost daily basis. The most vocal opponent was Mike Turner, who went so far as

1. The State Building Code is applicable to municipalities pursuant to Conn.Gen.Stat. § 29–253(a). It is based upon the BOCA National Building Code/1990 and parts of the 1992 Accumulative Supplement for the BOCA National Property Maintenance Code/1990 and other relevant BOCA supplements. "BOCA" stands for "Building Officials and Code Administrators." Conn.Gen.Stat. § 29–252(a); (City's Exh. 6).

to erect a fence to separate his property from the group home and to block access to the driveway to 421 Platt Street. (Defs.' Exh. # 16.) (Ms. Tsombanidis claims the fence was placed five feet over her property line.) Mr. Turner testified that, as a parent, when he found out that Oxford House–Jones Hill was a "drug rehab house," he became concerned about drugs on his front lawn and was concerned for his children. (Turner Dep. at 23.) Ms. Tsombanidis stated that she and her daughter received threatening phone calls, which she believes were from Mr. Turner, and that she was afraid of him. (Defs.' Exh. # 16.) According to Ms. Tsombanidis, Mr. Turner did not leave her alone until he felt that the City was going to take action against her. *Id.*

### 3. The Neighbors' Complaints to the City and the City's Response

In early September, 1997, the City received an anonymous call from a neighbor complaining that 421 Platt Avenue was operating as an illegal boarding house. On September 8, 1997, West Haven's Assistant Property Maintenance Code Official, Michael McCurry,[2] inspected the property and posted signs on the front and back doors charging Ms. Tsombanidis with performing work without a building permit.[3] Mr. McCurry testified that he spoke with Ms. Tsombanidis while at the property and she assured him that she would obtain the proper permits. (McCurry Dep at 39.)

Ms. Tsombanidis states that on the following day she called West Haven Building Official Frank Gladwin,[4] who told her that a permit was not needed for the work that was being performed.

On or about September 9, 1997, the City received a second call similar to the first. Mr. McCurry and Alfredo Evangelista, the City Zoning Enforcement Officer,[5] inspected the property and found numerous violations of the Property Maintenance Code, including smoke detectors missing from each bedroom, no ground fault circuit interrupters (GFCI) within six feet of all water sources, exposed wiring in one bedroom, and the outside garage in a deteriorated condition. Ms. Tsombanidis was present for the inspection and explained to the City officials about the operation of the house as an Oxford House facility. According to Ms. Tsombanidis, Mr. McCurry was very angry and told her she had 24 hours to get the residents out of the house. He stated that he would not want addicts in his neighborhood. (Tsombanidis' Dep. at 57, 58.) Mr. McCurry denies making these statements. (McCurry Dep. at 41.) Ms. Tsombanidis responded that she could not get the residents out in 24 hours and that she was not aware that an Oxford House facility had to have a zoning permit. (Tsombanidis Dep. at 57, 58.) Zoning Enforcement Officer Evangelista told her that he would notify her by mail concerning the zoning permit she would need to operate the house. Ms. Tsombanidis testi-

2. Michael McCurry, an Assistant Property Maintenance Code Official for the City of West Haven, was responsible for investigating violations of the City's Property Maintenance Code, which, like the State Building Code, is based on the BOCA National Building Code. He reported to Frank Gladwin, the Building Official for West Haven. (City's St. of Mat. Facts ¶¶ 12, 16.)

3. Mr. McCurry testified in his deposition that his first trip to the property was with Alfredo Evangelista. (McCurry Dep. at 34.) The Inspection Report signed by Mr. McCurry states that it was posted on September 8, 1997, at 16:15 hours. (City's Exh. 10.) The Citation signed by Mr. Evangelista states that he in-

spected the property on September 9, 1997. (City's Exh. 11.) Unless the date on the Inspection Report or the Citation is incorrect, it appears from the exhibits that the September 9th inspection was Mr. McCurry's second visit to the property, in accordance with Ms. Tsombanidis' testimony.

4. Frank Gladwin, as Building Official for West Haven, reported to James Hill, the Commissioner of Planning and Development. (City's St. of Mat. Facts ¶ 11.)

5. Alfredo Evangelista, the Zoning Enforcement Officer for West Haven, reported directly to Planning and Zoning Commissioner Hill. (City's St. of Mat. Facts ¶ 13.)

fied that she was extremely upset and in tears by the end of the meeting. *Id.* at 58.

That same day, Mr. Evangelista wrote Ms. Tsombanidis advising her that 421 Platt Avenue was operating as an "Illegal Boarding House in a residential zone," in "direct violation" of the City Zoning Regulations. She was ordered to remove the illegal boarding house within ten days of receipt of the letter. Failure to comply with this "order" would result in a fine of $99.00 for each day such violation continued. Mr. Evangelista also prepared a Citation to this effect, although it was not issued until September 22, 1997.

Charles Van der Burgh, Chief Financial Officer of Oxford House, Inc., responded to Mr. Evangelista in a twelve-page letter dated September 11, 1997, explaining the Oxford House concept, opining that the City's actions were in violation of the ADA and FHAA, and requesting the City to make a "reasonable accommodation" in the "application of its zoning ordinances and other municipal codes so that a group of recovering addicts and alcoholics residing together as a family can be afford[ed][sic] an equal opportunity to use and enjoy a single family dwelling." (Van der Burgh Letter at 1.) He explained that the residents act as a family and expressed his belief that "Oxford House is nothing more than a single family residence." *Id.* at 2; *see also id.* at 7. He emphasized that "Oxford Houses are not substance abuse centers, half-way houses, shelters or community care facilities," *id.*, nor are they rooming or boarding houses, since the residents rent the entire house, rather than a single room, and have access to the entire house. *Id.* He argued that requiring Oxford House–Jones Hill to obtain a conditional use permit because of a change in use would have a discriminatory effect on the residents because of the required public notice and hearing process that, in his opinion, would "galvanize neighbors in their opposition to the

homes" and stigmatize the residents by holding them up to public scrutiny. *Id.* at 10–11. He requested that the enforcement of any violations be held in abeyance until this matter could be resolved, hopefully in an amicable manner without the involvement of the United States Department of Housing and Urban Development. *Id.* at 1–2, 12.

On September 16, 1997, Property Maintenance Code Official McCurry wrote Ms. Tsombanidis that she was in violation of "PM 202.0" (the one-family dwelling provision of the West Haven Property Maintenance Code), which defines a one-family dwelling as "[a] building containing one dwelling unit with not more than three lodgers or boarders." Mr. McCurry also found violations of nine other Property Maintenance Code Ordinances, including PM 302.0—Public Nuisance, PM 303.7—Accessory Structures, PM 304.10—Handrails and Guards (Exterior), PM 304.11—Windows and Door Frames, PM 305.6—Handrails and Guards (Interior), PM 605.1—Installation (Electrical), PM 605.2—Receptacles—G.F.C.I., PM 705.5—Smoke Detectors, and PM 705.52—Power Source (Smoke Detectors). He ordered her to make fourteen alterations to the property and reduce the number of tenants to three. She had fourteen days to comply to avoid penalties for operating an illegal boarding house. Copies of his letter were sent to Building Official Gladwin, to James Hill, Commissioner of Planning and Development, to the City's Assistant Corporation Counsel, and to the Fire District. Ms. Tsombanidis made the repairs but did not evict any of the residents. Mr. McCurry states that after he advised Building Official Gladwin of the violations he had found, he ceased all enforcement activities pending the advice of the City Corporation Counsel.

On September 16th, Steven Polin, General Counsel for Oxford House, Inc., wrote Zoning Enforcement Officer Evangelista [6]

---

6. Although the letter is addressed to Mr.     Evangelista, the salutation is addressed to a

requesting that enforcement of the Notice of Violation be held in abeyance until the City made a determination of his request for an accommodation under the FHAA that would permit the residents to continue the single-family use of the premises. (His twelve-page letter reiterates the same legal arguments set forth in Van der Burgh's letter.)

Apparently, this request went unheeded for on September 22, 1997, Mr. Evangelista issued the September 9th Citation to Ms. Tsombanidis, which cited her with the offense of operating an "Illegal Boarding House—8 people lived at 421 Platt Avenue." She was ordered to pay a fine of $99.00 within 30 days. The Citation also gave her notice of her right to appeal the citation to the Zoning Board of Appeals within thirty days.[7]

Mr. Van der Burgh responded to the issuance of this Citation by letter dated September 25, 1997, again complaining that Mr. Evangelista was violating the FHAA and the rights of handicapped persons and advising him that this matter would be reported to the Civil Rights Division of the Department of Justice.

Mr. Hermes.

In the meantime, by late September or early October, 1997, a group of concerned neighbors met with the Mayor of West Haven, H. Richard Borer, on two occasions, complaining that a "drug rehab house" had been opened in their neighborhood without the neighbors having been notified. One of the neighbors, Paul Frosolone, a candidate for City Council, pressed the issue with the Mayor, Corporation Counsel, and Planning and Zoning, and circulated a petition around the neighborhood.[8] Mr. Frosolone testified that, in circulating the petition, he expressed his concern to the neighbors about Oxford House–Jones Hill being occupied by people going through rehabilitation. (Frosolone Dep. at 29.) He did not know what type of rehabilitation, but he did recognize that these persons were disabled. *Id.* The neighbors responded that they did not want this in their backyard. Eighty-four neighbors signed the petition protesting "the use of the property as a rooming house for people in rehabilitation," complaining that the house was in violation of numerous planning and zoning codes, and demanding an immediate cease and desist of this type of operation in a residential neighborhood setting.

**7.** Section 7–2.2 of the West Haven Land Use Regulations provides that the "Zoning Board of Appeals shall have all of the powers and duties conferred and imposed" by Chapter 124 of the General Statutes of Connecticut. Chapter 124, Title VIII, Conn.Gen.Stat. § 8–6(a), provides in relevant part that a zoning board of appeals shall have the power

(1) To hear and decide appeals where it is alleged that there is an error in any order, requirement or decision made by the official charged with the enforcement of this chapter or any bylaw, ordinance or regulation adopted under the provisions of this chapter; (2) to hear and decide all matters including special exceptions and special exemptions under section 8–2g upon which it is required to pass by the specific terms of the zoning bylaw, ordinance or regulation; and (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general

purpose and intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land

. . .

*See also* Conn.Gen.Stat. § 8–7 (Appeals to board. Hearings. Effective date of exceptions or variances; filing requirements). Article X of the West Haven Land Use Regulations gives the Zoning Board of Appeals the power to grant special use exceptions. Under section 10–3.3, the Zoning Board of Appeals may grant for a period of three years a special use exception in a residential district for a group home, after a public hearing and consideration of the impact on the surrounding neighborhood, and subject to the conditions set forth in the regulations.

**8.** According to Mr. Frosolone, he began complaining about Oxford House–Jones Hill in August and spoke with Mr. McCurry, Commissioner Hill, the Mayor, Corporation Counsel, and Planning and Zoning officials on several occasions about this matter.

On October 14, 1997, seventy-five neighbors attended a City Council meeting at which Mr. Frosolone presented the signed petition. Mr. Frosolone and several other neighbors addressed City Council, referring to Oxford House–Jones Hill as a "rehab house," asserting that they wanted the City to look into the situation and that they wanted it stopped. (Hearing Tr. at 1.) Another neighbor presented newspaper articles describing incidents where people living near rehabilitation houses had been injured or robbed. That neighbor proclaimed that it was a "disgrace to have something like this move in to [sic] the City of West Haven" and imploring City Council to do something as soon as possible. (Hearing Tr. at 2.) Other neighbors complained of the residents' playing loud music, driving like "maniacs," noise at four o'clock in the morning, violations of the building, health, planning and zoning codes, and even residents' "wolf whistl[ing]" at one neighbor's wife. (Hearing Tr. at 3.) Mayor Borer described the residents' reaction to Oxford House–Jones Hill as "very frustrated and angry" at the City's lack of action. (Borer Dep. at 17–18.) Mr. Frosolone and several neighbors also spoke with City officials in the Planning and Zoning Office about the Oxford House. Mr. McCurry told Mr. Frosolone that Oxford House–Jones Hill had been cited for several violations of building and fire codes and had been given a limited period of time to correct the violations.

The press covered all of these events and reported on the significant community opposition to Oxford House–Jones Hill and the ensuing legal battles.

### 4. Continued Enforcement Efforts by City and First Fire District

On November 24, 1997, Zoning Enforcement Officer Evangelista again wrote Ms. Tsombanidis, stating that she had been found in violation of Section 1–3.2 [9] of the West Haven Zoning Regulations and ordered her to comply with the regulations within ten days or face the imposition of fines and penalties. He advised her of her right to appeal to the Zoning Board of Appeals, which had the authority to grant a special use exception for group homes after consideration of an application. Thereafter, having received several letters from Oxford House counsel, Mr. Evangelista testified that he turned everything over to West Haven's Corporation Counsel to review before he took any further action. (Evangelista Dep. at 28–29, 50.) He did not, however, advise Ms. Tsombanidis of the fact that he was not going to take any further action against Oxford House–Jones Hill, (Evangelista Dep. at 29–30), and as discussed below, on March 20, 1998, he issued another Citation to Ms. Tsom-

9. Section 1–3.2 is the definitional section of the City of West Haven Land Use Regulations. It defines "family" as:

One or more persons who live together and maintain a common household, related by blood, marriage, or adoption. A group of not more than three (3) persons who need not be so related who are maintaining a common household together in a single dwelling unit and maintaining a household shall also be considered a family. A roomer, boarder or ledger [sic], shall not be considered a member of the family, and no roomer, boarder or lodger shall be permitted where the family is divided as a group of unrelated persons. A common household shall be deemed to exist if all members thereof have access to all parts of the dwelling unit.

A "rooming house (including boarding house)" is defined as:

Roomer, boarder or lodge person or persons occupying room or rooms forming a habitable unit limited to sleeping and living accommodations but not individual cooking facilities. It is further defined as any building which is used in whole or in part where the sleeping accommodations are furnished for hire or other consideration for more than one (1) but not more than eight (8) guests or employees of the management or in which four (4) or less sleeping rooms area [sic] maintained for such guests or employees. Members of the management's family shall not be considered guests or employees.

banidis for running an "illegal boarding house." (Pl.'s Exh. 10.)

On or about December 12, 1997, Building Official Gladwin and Richard Spreyer, Fire Inspector for the First Fire District, met with Ms. Tsombanidis to inspect Oxford House–Jones Hill because it exceeded the occupancy load for a single-family dwelling based on provisions of the State Building Code. (Gladwin Dep. at 30.) They performed a cursory walk-through of the house. On December 22, 1997, Building Official Gladwin wrote Ms. Tsombanidis regarding the "change in use" of the property and advised her that, under the State Building Code, she would need to apply for a building permit, provide interconnected smoke detectors in every bedroom and on every level of the house, provide at least one emergency escape window in every bedroom, and provide a second direct means of egress from the second floor to grade level. He advised her that she would have to communicate with the First Fire District Inspector concerning Fire Department requirements. Copies of this letter were sent to the Deputy Chief Fire Marshal and to Corporation Counsel. Mr. Gladwin testified that he also discussed this matter with the State Public Safety Office, although he cannot recall whether the FHAA or ADA was discussed. (Gladwin Dep. at 41–42.) He states that he then turned the matter over to West Haven Corporation Counsel and took no further enforcement action. (Gladwin Dep. at 52.)

On January 5, 1998, Fire Inspector Spreyer wrote Ms. Tsombanidis outlining the requirements of the Connecticut Fire Safety Code for a "lodging or rooming house,"[10] including installing escape windows in every bedroom, enclosing the interior stairs with a material having a fire resistance rating of at least twenty minutes and installing a fire alarm system, at least one smoke detector with a visible alarm, and an automatic sprinkler system throughout the house. Conn. Fire Safety Code §§ 20–2.1.2, –2.2, –3.3.1, –3.3.4.1, –3.5.2.[11] On March 9, 1998, Inspector Spreyer sent Ms. Tsombanidis a second abatement notice, ordering her to take corrective action to comply with the Connecticut Fire Safety Code within 15 days of her receipt of the letter.

On March 20, 1998, Mr. Evangelista issued another citation to Ms. Tsombanidis, again citing her with having an illegal boarding house and imposing the same $99.00 daily fine for violations not rectified within ten days.

On March 24, 1998, Attorney Polin responded to these letters on behalf of Ms. Tsombanidis, reiterating his position that operation of the Oxford House did not constitute a change in use from a single-family dwelling to a boarding house and that application of the State Fire Safety Code to a group of recovering substance abusers violated the FHAA. He requested that the City hold in abeyance further notices of violations until the issues raised by his letter had been resolved. He argued that the costs involved in making the required changes were prohibitive for both Oxford House–Jones Hill and Ms. Tsombanidis and that continued enforcement of the Building and Fire Safety Codes would result in the constructive eviction of the

---

10. The Connecticut Fire Safety Code § 20.1.1.1 provides that more than five but less than sixteen unrelated persons living together would be classified as a lodging or rooming occupancy.

11. Plaintiffs argue that the Fire Safety Code would not have applied to Oxford House–Jones Hill had it been classified as a single-family residence. This is not entirely correct. Section 29–305, Conn.Gen.Stat., provides that the local fire marshal must inspect, or cause to be inspected, once each calendar year, all buildings and facilities of public service, and all occupancies regulated by the Fire Safety Code within his jurisdiction, except residential buildings "designed to be occupied by one or two families which shall be inspected upon complaint or request of an owner or occupant, only for the purpose of determining whether the requirements specified in the [fire safety] code relative to smoke detection and warning equipment have been satisfied."

current residents, thus placing in jeopardy their recovery from alcoholism and drug abuse.

In response, Building Official Gladwin wrote Attorney Polin, reiterating his position that 421 Platt Avenue was a rooming or boarding house under the State Building Code and stating that Ms. Tsombanidis would have to apply for a certificate of occupancy for boarding house use and meet all Connecticut State Building Code requirements. (Pl.'s Exh. 17.)

Fire Inspector Spreyer did not respond directly to the letter but instead requested a determination from the State Fire Marshal as to the occupancy classification of 421 Platt Avenue under the Fire Safety Code.[12] By letter dated May 4, 1998, Douglas Peabody, the Deputy State Fire Marshal, responded that 421 Platt Avenue was a "Lodging & Rooming House," which was defined by the State Fire Safety Code as a building that provided accommodations for a total of sixteen or fewer persons (on either a transient or permanent basis), with or without meals, but without separate cooking facilities for occupants, except as provided in the "One & Two Family Dwelling" provisions. The "One & Two Family Dwelling" provisions applied only when there was a single family [13] with not more than five outsiders. When there were more than five outsiders, he stated, the building would be covered by the "Lodging & Rooming House" provisions. As to the issue of whether the FHAA applied to this situation, Deputy State Fire Marshal Peabody suggested that Fire Inspector Spreyer contact West Haven Corporation Counsel.

Inspector Spreyer testified that he was referred by Corporation Counsel to Assistant State Attorney Mary Galvin who advised him that the FHAA would not apply because the Life Safety Code was at issue rather than a zoning code. (Spreyer Dep. at 68–69.)

On June 16, 1998, following a re-inspection of the premises, Inspector Spreyer sent Ms. Tsombanidis a "FINAL NOTICE OF FIRE/LIFE SAFETY HAZARDS." Mr. Spreyer noted her continuing violations and ordered her to take the proper corrective action to remove or remedy all listed violations within 15 days. She was further advised that failure to comply with this notice constitutes a "crime of the General Statutes, with penalties of a fine not less than two hundred dollars nor more than one thousand dollars or imprisonment of up to six months, or both, as prescribed in Section 29–295. Non-compliance may also result in a civil proceeding against you, as authorized in Section 29–306." (Pl.'s Exh. 15.)

Mayor Borer testified that he discussed the matter of Oxford House–Jones Hill with the Mayor of New Haven, where he understood a number of other Oxford House facilities were located, to determine how New Haven was handling the situa-

12. According to plaintiffs, Fire Inspector Spreyer never advised the State Fire Marshal's Office that the house was occupied by recovering alcoholics and drug addicts. Although he did not specifically use those terms in his letter, he did state that 421 Platt Avenue was an "Oxford House," and sent a file of materials along with his letter, which contained the letter from Attorney Polin.

13. The Deputy State Fire Marshal noted that the term "family" was not defined in the current NFPA Life Safety Code. Under the NFPA Life Safety Code, the determination of what constitutes a "family" is left up to the jurisdictional authority. The Deputy State Fire Marshal stated that historically, the NFPA Committee on the Life Safety Code has defined "family" as "a social unit consisting of parents and children that they rear, the children of the same parents and one's husband (or wife) and including children which they adopt." He also cited to other similar definitions, noting that the intent of the NFPA Life Safety Code, on which the Connecticut Fire Safety Code is based, was to recognize the level of communication and awareness shared by family members and that there was a head of household responsible for the overall safety of the dwelling. As the number of outsiders increase, he noted, the additional minimum safety features required by the Life Safety Code increase.

tion with respect "to protecting the integrity of a residential neighborhood" and addressing neighbors' complaints about the operation of an Oxford House in their neighborhood. (Borer Dep. at 53.) The Mayor of New Haven told him, in very general terms, that Oxford Houses had "special federal status which allow for them to facilitate their operations." *Id.* at 52. He also recalled that the Mayor of New Haven "might have mentioned" that "with ADA regulations, they might get special status that usurps the zoning codes." *Id.* at 53–54.

No further enforcement actions have been taken by the City or the First Fire District. City officials turned the matter over to the City's Corporation Counsel and all enforcement activities against Ms. Tsombanidis were discontinued upon the advice of Counsel. Likewise, upon the advice of Corporation Counsel, the First Fire District decided not to proceed with its enforcement of the Final Abatement Notice.

To date, plaintiffs have not sought a special use exception from the Board of Zoning Appeals [14] or a variation or exemption from the State Building Inspector,[15] nor have they sought a variation or exemption from the State Fire Marshal.[16] Plaintiffs state that the Zoning Board Appeals process requires public notice and a public hearing, which would necessarily subject the Oxford House–Jones Hill residents to unwanted public scrutiny.

On July 9, 1998, plaintiffs filed the instant law suit against the City of West Haven and, on December 1, 1998, amended their suit to add the First Fire District as a party-defendant.

## II. DISCUSSION

### A. THE PARTIES' CONTENTIONS

#### 1. Plaintiffs' Claims

Plaintiffs allege that as "aggrieved persons" and persons with a "handicap," they are entitled to the protections of the FHAA, 42 U.S.C. § 3602(h) and (i),[17] and, as qualified individuals with disabilities, they are protected by the ADA. 42 U.S.C. § 12131(2).[18] Defendants do not dispute

---

**14.** *See* Note 7, *supra.*

**15.** City Building Official Gladwin testified that he does not have the authority to grant an exemption from the State Building Code. That determination is made by the State. (Gladwin Dep. at 104.) Section 29–254(b), Conn.Gen.Stat., gives the State Building Inspector the authority to grant variations or exemptions from the State Building Code where strict compliance would entail practical difficulty or unnecessary hardship, or is adjudged unwarranted, provided that the intent of the law shall be observed and public welfare and safety assured. Any person aggrieved by a decision of the State Building Inspector then has a right of appeal to the State Codes and Standards Committee and from there to the Superior Court. *Id.*

**16.** Section 29–296, Conn.Gen.Stat., provides that the State Fire Marshal may grant variations or exemptions from any regulation issued pursuant to the Fire Safety Code, where strict compliance would entail practical difficulty or unnecessary hardship or is adjudged unwarranted, provided that any such variation or exemption shall, in the opinion of the State Fire Marshal, secure the public safety.

**17.** The FHAA defines "handicap" as

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
(2) a record of having such an impairment, or
(3) being regarded as having such an impairment, but
such term does not include current, illegal use of or addiction to a controlled substance....
42 U.S.C. § 3602(h).

**18.** Section 12131(2) of Title 42, United States Code, provides:

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

that persons who are non-abusing, recovering alcohols and drug addicts are covered by the FHAA and ADA.[19] *See* 42 U.S.C. § 3602(h) and 24 C.F.R. § 100.201(a)(2); 42 U.S.C. § 12210(b)(1) and (2).

Plaintiffs assert that by virtue of defendants' refusal to consider and apply the FHAA and ADA in interpreting and applying the Connecticut Fire Safety Code and the State Building Code, defendants have prevented Oxford House, Inc., from establishing and maintaining recovery houses within the City of West Haven. They further claim that enforcement of the Fire Safety Code and State Building Code against the John Doe plaintiffs will leave them without shelter and will greatly increase the likelihood that these individuals will relapse into alcohol and drug abuse. They assert that defendants are treating the Oxford House–Jones Hill residents in a discriminatory manner by imposing more stringent building, fire safety, and zoning code requirements on this group of unrelated, disabled persons than they impose on individuals who are related by blood or marriage and who live together in a single-family district. They further allege that by arbitrarily classifying Oxford House–Jones Hill as a lodging, rooming and/or boarding house, defendants are making single-family housing in the City of West Haven unavailable to persons recovering from drug and alcohol addiction. Plaintiffs assert that they have been denied equal protection of the laws by virtue of the arbitrary manner in which defendants

have classified Oxford House–Jones Hill and by defendants' refusal to consider plaintiffs' request for a reasonable accommodation.

Defendants have denied these allegations and have moved for summary judgment on all counts of plaintiffs' complaint.

### 2. The City's Summary Judgment Arguments

The City of West Haven now seeks summary judgment on the following grounds:

(1) There is insufficient evidence, as a matter of law, to support a claim of intentional discrimination.

(2) There is insufficient evidence, as a matter of law, to support a claim of disparate impact discrimination.

(3) Plaintiffs' claim that the City failed to make a "reasonable accommodation" is not ripe for adjudication.

(4) Even assuming the matter is ripe for adjudication, there is insufficient evidence, as a matter of law, to support plaintiffs' claim that the City failed to make a reasonable accommodation.

(5) Plaintiffs have not stated a claim for violation of Title II of the ADA.

(6) Discrimination under the FHAA and ADA does not present a claim cognizable under section 1983.

(7) Even assuming that plaintiffs can assert a section 1983 claim, they have failed as a matter of law to demonstrate a denial

---

**19.** The legislative history of the FHAA explains that individuals who have a record of drug use or addiction but who do not currently use illegal drugs are protected if they fall under the definition of handicap. The Committee stated that it did not intend to exclude individuals who have recovered from an addiction and were participating in a treatment program or self-help group such as Narcotics Anonymous.

> Just like any other persons with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such

individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

H.R.Rep. No. 100–711, 100th Cong., 2d Sess., App. II–12 to –13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173. The House Report further stated that individuals who have been perceived as being a drug user or an addict are covered under the definition if they can demonstrate that they are being regarded as having an impairment and that they are not currently using an illegal drug. *Id.* at App. II–13.

of equal protection under the Fourteenth Amendment.

### 3. The Fire District's Summary Judgment Arguments

The First Fire District raises the following arguments in its motion for summary judgment:

(1) The relevant sections of the Connecticut Fire Safety Code, on their face or as applied, do not discriminate against persons on the basis of disability.

(2) There is no reasonable accommodation that can replace enforcement of the Connecticut Fire Safety Code.

(3) Even if there were such an accommodation, this defendant has no authority to grant such an accommodation to plaintiffs.

### 4. Plaintiffs' Opposition to the Summary Judgment Motions

As to both motions, plaintiffs maintain that there are genuine issues of material fact concerning (1) whether defendants acted with discriminatory intent and/or arbitrarily and capriciously in their acquiescence to public opposition to Oxford House–Jones Hill, in their multiple enforcement efforts, and in their blatant refusal to consider the FHAA and ADA in their treatment of Oxford House–Jones Hill; (2) whether the City's enforcement of its zoning ordinance and the State Building Code and the First Fire District's enforcement of the Fire Safety Code had a disparate impact on plaintiffs as opposed to non-disabled persons; and (3) whether defendants' refusal to treat the Oxford House–Jones Hill as they would a single-family home constitutes a failure to provide a reasonable accommodation.

### B. SUMMARY JUDGMENT STANDARD

The general principles applicable to summary judgment motions are well-settled. Under Rule 56(c), Fed.R.Civ.P., summary judgment shall be rendered forthwith "if the pleadings, depositions, [and] answers to interrogatories ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The burden of showing that there is no genuine factual dispute rests upon the moving party. See Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994). In assessing the record to determine if such issues exist, we are required to resolve all ambiguities in favor of the party against whom summary judgment is sought and to draw all permissible inferences in that party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This remedy, which precludes a trial, is properly granted only when no rational jury could find in favor of the non-moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir.), cert. denied, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000).

### C. THE APPLICABLE STATUTORY FRAMEWORK

Both Title II of the ADA and the FHAA prohibit discrimination by a public entity against handicapped or disabled persons, and both statutes have been interpreted to apply to a municipality's zoning decisions and enforcement actions. See Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 151 (2d Cir. 1999); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44 (2d Cir. 1997); LeBlanc–Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir.1995).

The Fair Housing Amendments Act of 1988 extended to "handicapped" persons the protections embodied in the Fair Housing Act against discrimination in housing. H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 13 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2174. Under the FHAA, it is unlawful

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a

dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter, [or]

(B) a person residing in or intending to reside in that dwelling. . . .

42 U.S.C. § 3604(f)(1). It is also unlawful [t]o discriminate against any person . . . in the provision of services or facilities in connection with such dwelling, because of a handicap of—

(A) that person; or

(B) a person residing in or intending to reside in that dwelling . . .

42 U.S.C. § 3604(f)(2). For purposes of this subsection, "discrimination" includes

a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; . . . .

42 U.S.C. § 3604(f)(3)(B).

The legislative history of the 1988 Amendments to the Fair Housing Act states that the amendments "would also apply to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps." [20] H.R.Rep. 100–711, App. II–14. The Report explained that while state and local governments have the authority to protect safety and health and

to regulate the use of land, that authority has at times been used to restrict the ability of handicapped individuals to live in communities through the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities. *Id.* (citing *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

■ A plaintiff can prove an FHAA violation by showing (1) intentional discrimination; (2) discriminatory impact; or (3) a refusal to make a reasonable accommodation. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d at 425; *Smith and Lee Assocs., Inc. v. City of Taylor,* 102 F.3d 781, 790 (6th Cir.1996); *Robinson v. City of Friendswood,* 890 F.Supp. 616, 622 (S.D.Tex.1995). In this case, plaintiffs are proceeding under all three theories of discrimination.

■ Similarly, Title II of the ADA provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, pro-

---

**20.** While the *FHAA* contains an exemption for "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling," 42 U.S.C. § 3607(b)(1), the Supreme Court in *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995), held that this exemption applied to "maximum occupancy restrictions" that cap the total number of occupants in order to prevent overcrowding of a dwelling (typically based upon the available floor space, or the number or types of rooms), *id.* at 733, 115 S.Ct. 1776, but that it did not apply to "family composition rules" designed to preserve the family character of a neighborhood based on the composition of a household rather than the total number of occupants living quarters can contain. *Id.* at 734, 115 S.Ct. 1776. Accordingly, West Haven's Land Use Regulations defining family in terms of one or more

persons related by blood, marriage, or adoption, or a group of not more than three persons who are not so related, that maintain a common household together in a single dwelling, are not covered by the exemption and are subject to the FHAA. *See Oxford House–C v. City of St. Louis,* 77 F.3d 249, 251 (8th Cir.), *cert. denied,* 519 U.S. 816, 117 S.Ct. 65, 136 L.Ed.2d 27 (1996). Similarly, the provisions of the Connecticut Fire Safety Code defining a single family residence in terms of five unrelated persons would not qualify for the § 3607(b)(1) exemption. The Supreme Court in *Edmonds,* however, expressly did not decide whether the City's actions against Oxford House violated the FHAA's prohibitions against discrimination set forth in § 3604(f)(1)(A) and (f)(3)(B) (discrimination in the provision of services or in the failure to make a reasonable accommodation). *See* 514 U.S. at 738, 115 S.Ct. 1776.

grams, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1994). The ADA was enacted in part to prevent the isolation and segregation of individuals with disabilities and to promote their assimilation into the mainstream of all aspects of community life, including housing. *See Pack v. Clayton County*, No. 1:93–cv–836–RHH, 1993 WL 837007, at *8 (N.D.Ga. Aug.27, 1993), *aff'd*, 47 F.3d 430 (11th Cir.1995) (Table). Under the ADA, local governments are explicitly prohibited from administering zoning procedures in a manner that subjects persons with disabilities to discrimination on the basis of their disability. *Id.* (citing 28 C.F.R. § 35.130(b)(6)). The ADA also requires such entities to make reasonable accommodations for people with disabilities. 42 U.S.C. § 12131(2).

The legal analyses under both statutes are the same for plaintiffs' discrimination claims and, thus, for purposes of ruling on these motions for summary judgment, we will consider them together. *See Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F.Supp.2d 941 (E.D.Wis. 1998).

## D. INTENTIONAL DISCRIMINATION UNDER THE FHAA AND ADA

Plaintiffs claim that defendants have intentionally discriminated against them because of their handicap by imposing more stringent building, fire safety and zoning requirements on them than they impose on individuals related by blood, marriage or adoption and living in single-family districts. They further allege that defendants have arbitrarily classified Oxford House–Jones Hill as a lodging, rooming or boarding house, rather than a single-family residence. Both defendants urge this Court to grant summary judgment in their

favor on plaintiffs' intentional discrimination claims under the FHAA and ADA on the ground that there is no evidence of intentional discrimination by either entity.

■■■ A local government or governmental entity using zoning powers in a discriminatory manner violates the FHAA and the ADA. *Robinson*, 890 F.Supp. at 622; *Innovative Health Sys.*, 117 F.3d at 49. The critical inquiry is whether a discriminatory purpose was a "motivating factor" in the decisions or actions of the defendants.[21] "The intent of which the court speaks is the legal concept of intent, to be distinguished from motive." *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Fairfield*, 790 F.Supp. 1197, 1212 (D.Conn.1992). Plaintiffs are not required to show that the defendants were motivated by some purposeful, malicious desire to discriminate against handicapped persons; nor must they prove that defendants were motivated solely, primarily, or even predominantly by the handicapped status of the persons affected. They need only show that their handicapped status was a motivating factor in the defendants' decision. *Id.* As the Supreme Court stated in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), a plaintiff is not required "to prove that the challenged action rested solely on ... discriminatory purposes."

> Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits

**21.** Although the proper analytical framework for a claim of intentional discrimination is the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in this

case, the Court has assumed that plaintiffs have met their *prima facie* burden and that defendants have articulated a legitimate, nondiscriminatory reason for their actions.

of their decisions, absent a showing of arbitrariness or irrationality. But [ ] discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been *a motivating factor* in the decision, this judicial deference is no longer justified.

*Id.* at 265–66, 97 S.Ct. 555 (footnotes omitted; emphasis added); *see also Pack v. Clayton County,* 1993 WL 837007, at *10 (holding that plaintiffs need only demonstrate that their status as AIDS patients was one factor in the County's decision not to grant their group home the requested license). Factors to be considered in evaluating a claim of discriminatory decision-making include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; and (5) departures from normal substantive criteria. *See Village of Arlington Heights,* 429 U.S. at 266–68, 97 S.Ct. 555; *Angell v. Zinsser,* 473 F.Supp. 488, 497 (D.Conn.1979); *Stewart B. McKinney Found.,* 790 F.Supp. at 1211.

### 1. *Intentional Discrimination by the City*

The City argues that there have been no official expressions of bias and cites to what it contends is the sole allegation of bias by a City official, that being the comments by Assistant Property Maintenance Code Official McCurry that he was angry, that Ms. Tsombanidis had only twenty-four hours to remove the Oxford House residents from her house, and that he would not want addicts living in his neighborhood. Mr. McCurry has denied making these statements and defendants attempt to cast doubt on plaintiff's credibility in this regard. However, in ruling on a motion for summary judgment, we are not "to weigh the evidence but [are] instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996); *see also McCarthy v. New York City Technical College,* 202 F.3d 161, 166 (2d Cir. 2000). Thus, for purposes of this motion, we will credit Ms. Tsombanidis' testimony concerning hostile comments made by Mr. McCurry during their meeting at Oxford House–Jones Hill.

■ Even so, official expressions or admissions of bias are not the determining factor in our analysis of whether an administrative or governmental body acted with discriminatory intent. As the City concedes, even where individual members of government are found not to be biased themselves, liability may still be imposed where discriminatory governmental actions are in response to significant community bias. "[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys.,* 117 F.3d at 49; *see also Support Ministries for Persons with AIDS, Inc. v. Village of Waterford,* 808 F.Supp. 120, 134 (N.D.N.Y.1992) (holding that zoning officials who bowed to political pressure by those with animus against people with alcohol and drug-related disabilities violated the FHAA).

■ Plaintiffs cite to the events leading up to the City's enforcement actions and City officials' departures from normal procedures as evidence of intentional discrimination. Plaintiffs have provided evidence that complaints by neighbors about recovering addicts and alcoholics living in their neighborhood prompted the City's initial action against Oxford House–Jones Hill. The record also reflects that the City faced intense pressure from angry residents to take action against Oxford House–Jones Hill. Neighbors organized a petition-signing drive, spoke out at a City Council meeting, and met with the Mayor and other City officials on several occasions,

pleading with the City to order an immediate cease and desist to this "rehab house" and expressing anger at the City's lack of action. Several of the group met with the Mayor and building and zoning officials to determine the status of the City's enforcement efforts and what was being done. The Mayor described the neighbors as very angry and consulted with the Mayor of New Haven to determine whether New Haven had received the same community opposition to Oxford House group homes and to find out how he had handles the problem. Plaintiffs assert that based on the community opposition to Oxford House–Jones Hill, the City reversed its original position that Oxford House–Jones Hill was protected by the FHAA against application of the City's land use laws.

Plaintiffs also argue that Mr. McCurry's citing the house for failing to have obtained certain building permits (which they contend were not required) was, in reality, just an excuse to inspect the house because it was a group home for recovering alcoholics and addicts. Plaintiffs further assert that there is no legal support in the Property Maintenance Code for Mr. McCurry's ordering Ms. Tsombanidis to evict the residents within twenty-four hours, which, they claim, leads to the logical inference that his actions were motivated by a discriminatory animus toward the residents.

Plaintiffs also cite to the City's unprecedented involvement of the Fire District in zoning and building issues. They argue that this departure from ordinary procedures was the result of the City's enhanced enforcement efforts directed at Oxford House–Jones Hill because of the nature of its residents.

The City characterizes the Mayor's meeting with concerned citizens as "routine" and argues that there was no official yielding to community discrimination. That is a question of fact that cannot, and will not, be resolved on summary judgment.

The City declares that "representative government requires that even arguably intolerant citizens have the right to have their complaints investigated." (City's Br. at 21.) That right is not disputed nor at issue in this case. *See Boy Scouts of America v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 2457–58, 147 L.Ed.2d 554 (2000); *White v. Lee,* 227 F.3d 1214, 1224 (9th Cir.2000) ("The right to expressive association includes the right to pursue, as a group, discriminatory policies that are antithetical to the concept of equality for all persons.") Rather, it is the City's actions taken in response to these complaints that the Court must examine in determining whether their actions were motivated in part by plaintiffs' handicapped status. (In this regard, the Court is not "self-righteous[ly]" dismissing the "concerns of residents of impacted neighborhoods as wholly unfounded or biased," as the City suggests. (City's Br. at 21.)).

At this summary judgment stage, the Court finds that the plaintiffs have provided sufficient evidence of the events leading up to the City's enforcement activities and departures from the normal procedures and substantive criteria to raise genuine issues of material fact as to whether actions taken by City officials were motivated in part a discriminatory purpose. Accordingly, the Court denies the City's motion for summary judgment as to plaintiffs' intentional discrimination claim under the FHAA and ADA.

### 2. Intentional Discrimination by the First Fire District

■ Plaintiffs argue that the Fire District similarly failed to follow normal procedures in this case. They cite to the Fire District's working with the City on this matter, the joint inspections, and the copies of letters to and from the City and Fire District.

The First Fire District's initial response was precipitated by the City's notice of an illegal boarding house. Although this may have been an unusual or even unprece-

dented sequence of events, that fact standing alone does not raise an inference that the Fire District acted with discriminatory motive in citing Oxford House–Jones Hill. There is no evidence that community opposition to Oxford House–Jones Hill played any role in the Fire District's enforcement efforts. In fact, there is no evidence that any fire official was even aware of the community opposition to Oxford House–Jones Hill. There also is no evidence that Inspector Spreyer or Deputy State Fire Marshal Peabody or any other fire official harbored any personal animosity toward the residents of this group home.

Plaintiffs cite to the fact that the Fire District has produced evidence of only one other building in West Haven previously cited as an illegal boarding house.[22] While this could be probative of the Fire District's selective and discriminatory enforcement of the Fire Safety Code, plaintiffs have failed to produce any evidence that there were other illegal group homes or boarding houses occupied by non-handicapped persons that were not cited. Plaintiffs merely assert that "there are almost certainly other rooming or boarding houses in West Haven that have entirely escaped detection and enforcement action by the City and Fire District." (Pls.' Mem. at 39.) Plaintiffs then speculate that the "difference between those households and plaintiffs' household at 421 Platt Avenue, is that plaintiffs are people with disabilities, and their neighbors did not want them in the neighborhood for that reason." *Id.* Plaintiffs, however, have offered no evidence in support of this speculative conclusion.

Plaintiffs also complain that when Fire Inspector Spreyer requested an opinion from the Deputy State Fire Marshal as to the occupancy class that should be used to determine Fire Safety Code compliance, he failed to advise the Deputy State Fire Marshal of the handicapped or disabled status of the residents. As noted above, while Inspector Spreyer did not directly address this fact in his letter, he did include a letter from Attorney Polin which discussed at length the nature of an Oxford House facility. Moreover, the fact that he did not dwell on the fact that the residents were recovering alcoholics and drug abusers does not raise an inference of intentional discrimination, as plaintiffs suggest. Instead, it more logically supports an inference of non-discrimination, *i.e.*, that Inspector Spreyer wanted an unbiased opinion from the State Fire Marshal as to the occupancy class of this group home without regard to the fact that the residents were former alcoholics and addicts.

Plaintiffs also complain that Deputy State Fire Marshal Peabody "avoided this issue" in his response and the "Fire District enforced the directive nevertheless." (Pls.' Mem. at 38.) Although it is true that the Deputy State Fire Marshal did not address the legal implications of the FHAA and instead referred Inspector Spreyer to the City's Corporation Counsel, this does support a reasonable inference that Inspector Spreyer acted with discriminatory intent in following the directive from the State. Indeed, Inspector Spreyer states that he followed up on this directive and contacted Corporation Counsel. Moreover, the First Fire District did not have the legal authority to depart from the requirements of the State Fire Safety Code. *See* Note 28, *infr.* Any modification of these rules had to be granted by the State Fire Marshal.

After a careful review of the facts of record, the Court finds that plaintiffs have failed to provide any evidence from which a reasonable trier of fact could conclude that the First Fire District acted with a discriminatory motive in enforcing the Fire Safety Code against Oxford House–Jones Hill or in classifying Oxford House–Jones Hill as a boarding or rooming house. Accordingly, the Court grants summary

---

**22.** Inspector Spreyer testified that he had cited four illegal boarding houses in West Haven for violations of various Fire Safety Code requirements. (Spreyer Dep. at 23, 52.)

judgment in favor of the Fire District on plaintiffs' claims of intentional discrimination under the FHAA and ADA.

## E. DISPARATE IMPACT DISCRIMINATION UNDER THE FHAA AND ADA

Plaintiffs next allege that defendants' classification of Oxford House–Jones Hill as a lodging or boarding house rather than a single-family residence had a discriminatory impact on them based upon their handicapped status and, thus, violates the FHAA and ADA.

■ Disparate impact claims are premised on facially neutral policies or practices which are adopted without a discriminatory motive but which, when applied, have a discriminatory effect on a group of individuals who enjoy protected status under the anti-discrimination laws. *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934–36 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). In this case, plaintiffs challenge the discriminatory effect on handicapped persons of the defendants' application of the facially neutral State Building and Fire Safety Codes.

■ In order to establish a *prima facie* case of disparate impact discrimination, plaintiffs must show that the challenged practice "actually or predictably" results in disparate impact discrimination. *Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179, 1182–83 (E.D.N.Y.1993). Discriminatory intent need not be shown. *Huntington Branch, NAACP,* 844 F.2d at 934–36. Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that inter-

est with less discriminatory effect." *Id.* at 936 (internal quotations and citations omitted).[23] In the end, this Court must balance plaintiffs' showing of adverse impact against defendants' justifications for their conduct. *Corporation of the Episcopal Church in Utah v. West Valley City,* 119 F.Supp.2d 1215, 1219 (D.Utah 2000) (citing *Huntingon Branch, NAACP,* 844 F.2d at 936). Two factors that will weigh heavily in plaintiffs' favor are: (1) evidence of discriminatory intent on the part of defendants (although evidence of discriminatory intent is not required); and (2) evidence that plaintiffs are seeking only to require defendants to eliminate an obstacle to housing rather than suing to compel defendants to build housing (the former requiring a less substantial justification from defendant for its actions). *Id.*

In *Huntington Branch, NAACP,* the Court noted the complexity of considerations that drive a municipality's preference to maintain a particular zoning category for certain sections of the community. 844 F.2d at 936. That factor, the Court noted, does not relieve a court of its obligation to assess whatever justifications the municipality advances for its facially neutral zoning ordinance and weigh those justifications carefully against the degree of adverse impact the plaintiffs have shown. *Id.* at 937. "Though a town's interests in zoning requirements are substantial, ... they cannot, consistently with Title VIII [the Fair Housing Act], automatically outweigh significant disparate effects." *Id.* (internal citations omitted).

■ Thus, we begin by examining the alleged adverse impact of defendants' application of the State Building and Fire Safety Codes on this group of handicapped individuals. Plaintiffs have produced substantial evidence demonstrating that, as

**23.** The Court in *Huntington Branch, NAACP,* 844 F.2d at 939, held that in considering the defendants' justifications, the Court should first consider whether there is a less discriminatory alternative. If there is no less discriminatory alternative, the Court should scrutinize the justifications proffered by the defendants to determine their legitimacy and *bona fide* good faith, by inquiring whether the reasons were of substantial concern such that they would justify a reasonable official in making this determination.

recovering addicts and alcoholics, they need a supportive group living arrangement in a residential neighborhood. Therefore, they argue, the inflexible application of regulations that limit the number of unrelated individuals sharing a household discriminatorily impacts them as handicapped individuals.

Courts have repeatedly found that facially neutral definitions of "family" in municipal zoning codes and life or fire safety codes that result in the imposition of more stringent requirements on groups of unrelated persons living together have a greater adverse impact on disabled persons than non-disabled persons. In *Oxford House v. Town of Babylon*, 819 F.Supp. at 1183, a case factually similar to the instant case, the court found that application of the town code defining "family" as a group of persons related by kinship, adoption, blood or marriage, had a disparate impact on Oxford House residents who require a group living arrangement in a residential neighborhood for psychological or emotional support. As a result, the court concluded, Oxford House residents are more likely than those without handicaps to live with unrelated individuals. *Id.* at 1183. The court then considered whether the Town had carried its burden of showing that its actions furthered a legitimate governmental interest and that there were no less discriminatory alternatives. The Town maintained that it enforced the ordinance against all violators, that the ordinance furthered a legitimate governmental interest in maintaining the residential character of neighborhoods zoned single-family residential, and that any discriminatory effect was the result of plaintiffs' transiency and not because of their handicapped status. The court found that presence of the particular Oxford House at issue did not undermine the purpose of the Town's zoning ordinance. Further, the court held that, even if the Town's enforcement of its zoning ordinance furthered a legitimate governmental interest, plaintiffs' showing of discriminatory effect far outweighed what it characterized as the Town's "weak justi-

fications." *Id.* at 1184. Additionally, the court found evidence of intent to discriminate on the part of Town officials based on evidence of town meetings where neighbors expressed their hostile opposition to having recovering alcoholics living in their neighborhood and the Town's reaction to these complaints.

In another case, *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 461 (D.N.J.1992), Oxford House challenged the Township's rule that all groups of unrelated individuals wishing to live together must apply for a zoning variance prior to receiving a certificate of occupancy ("C.O."), since they were presumed not to constitute a "family," whereas related individuals were presumed to constitute a family and did not need to go through this process. The court found that the plaintiffs had established a *prima facie* case of disparate impact by showing that the Township's interpretation of the definition of "family" in its zoning ordinance imposed more stringent requirements on groups of unrelated individuals wishing to live together in a rental property than on individuals related by blood or marriage. The court further found that the Township did not meet its burden of establishing that no less restrictive alternative was available or that no reasonable accommodation could be made. Indeed, the court found that accommodating plaintiffs by waiving the single-family requirement and granting them a C.O. would not impose any financial or administrative burdens on the Township whatsoever and would not effect a fundamental change in the nature of the neighborhood. *Id.* at 462.

Defendants take the position that, in order to establish a *prima facie* case of disparate impact discrimination, plaintiffs must make an actual showing that they have been treated differently than similarly situated, non-handicapped and unrelated persons living together. In other words, defendants would have us compare the impact of the City's zoning code on the

Oxford House residents with its impact on groups of eight unrelated, non-disabled individuals.[24] *See Gamble v. City of Escondido,* 104 F.3d 300, 306–07 (9th Cir.1997) (In a case challenging the City's denial of a building permit for a group home for the disabled because of the size of the facility, the court held that a *prima facie* case of adverse impact discrimination under the FHAA required the plaintiff to show that the defendant's actions had a discriminatory effect on the physically disabled compared to groups of a similar size living together; otherwise "all that has been demonstrated is a discriminatory effect on group living."); *Corporation of the Episcopal Church,* 119 F.Supp.2d at 1219 (In a case challenging the City's refusal to permit the construction of a group home for recovering drug addicts in a residentially zoned neighborhood, the court held that plaintiffs must show that they have been treated differently than other similarly situated groups.); *Hemisphere Bldg. Co. v. Village of Richton Park,* 171 F.3d 437, 440–41 (7th Cir.1999) (finding that a zoning ordinance limiting the number of dwellings per acre, thus increasing the cost of group housing, did not have an discriminatory adverse impact on handicapped individuals seeking group housing, because the ordinance increased the cost of housing for everyone, not just handicapped individuals). Defendants maintain that plaintiffs have failed to produce any evidence that they were treated any differently than any other similarly sized group of non-related, non-disabled individuals seeking to live in a single-family residential district, such as students or veterans groups.

Defendants correctly point out that a critical inquiry in a disparate impact case is the relevant group for comparison purposes. Admittedly, the cases cited by plaintiffs and defendants are difficult to reconcile. We note that the cases cited by defendants involved applications for permits for new construction as opposed to the *Oxford House* cases relied on by plaintiffs, which concerned whether existing housing would be available to handicapped persons. However, we need not decide that precise issue for we find that plaintiffs have presented sufficient evidence to defeat defendants' motion for summary judgment under either scenario.

Plaintiffs have presented sufficient evidence from which a reasonable jury could find that defendants' classification of Oxford House–Jones Hill as a boarding or lodging house would have an adverse impact on plaintiffs, as disabled individuals, compared to a similarly sized family where the individuals were related by blood, marriage or adoption. The State Building and Fire Safety Codes impose significant building requirements on boarding and lodging houses that are not imposed on single-family residences, which would necessarily limit the number of houses available to Oxford House residents. Plaintiffs have also produced substantial evidence of their need to live in a group home setting in a residential neighborhood in order to facilitate their continued recovery from alcoholism and drug addiction. This is a need that non-handicapped persons do not share and, thus, they would not be impacted as greatly in terms of their housing opportunities as Oxford House residents. *See Huntington Branch, NAACP,* 844 F.2d at

---

24. The City also argues that, as a second step in proving adverse impact, plaintiffs must "demonstrate a disparate impact on persons financially capable of living in a single family residence as part of a group of three or more persons unrelated by blood, marriage or adoption." (City's Mem. at 27.) We disagree with defendants that this second step is a necessary part of the disparate impact analysis. There is nothing in the City's zoning laws that requires an individual to have a certain level of income to live in a single-family district. *See Hemisphere Bldg. Co. v. Village of Richton Park,* 171 F.3d 437, 440 (7th Cir. 1999) (holding that the duty of reasonable accommodation should be confined to rules, policies, practices, or services that hurt handicapped people by reason of their handicap rather than those that hurt them by virtue of what they have in common with other people, such as a limited amount of money to spend on housing).

938 (finding adverse impact in City's rezoning decision based upon percentage of minorities who required subsidized housing as compared to overall percentage of town residents requiring subsidized housing).

In *Huntington Branch, NAACP*, 844 F.2d at 934, the Second Circuit directed that, in determining whether evidence of discriminatory effect is sufficient, the courts should look to the congressional purpose of the statute as gleaned from the legislative history, related Title VII jurisprudence, and practical concerns. The House Report on the FHAA emphasizes that the 1988 Amendments were "intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special-use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." H.R.Rep. No. 100–711 at 24. This is precisely plaintiffs' complaint.

Plaintiffs have also produced evidence of defendants' selective enforcement of these code provisions against their group home. For example, they have cited to testimony of Zoning Commissioner Hill that, in his eleven and one-half years with the City of West Haven, he had never attempted to force out boarding house inhabitants by inspecting and enforcing the zoning regulations against them, despite the knowledge of City officials that they were aware of other group living arrangements in the City. (Hill Dep. at 99–102.) The City, of course, disputes this and claims that the zoning regulations have been routinely applied to non-handicapped groups of persons, including students and veterans groups. (Evangelista Dep. at 12, 13, 40–45; Gladwin Dep. at 72–74.) At a minimum, as we have previously found, there are genuine issues of material fact as to the City's discriminatory enforcement efforts directed toward the Oxford House residents. That, in combination with the evidence of discriminatory intent and the fact that plaintiffs are seeking to compel defendants to eliminate an obstacle to their housing, rather than build housing for them, the evidence that plaintiffs have presented creates a genuine issue of material fact as to whether defendants' code enforcement has a disparate impact on plaintiffs.

Further, although there clearly are legitimate reasons justifying limitations on the number of individuals who may reside in a single-family district,[25] the City has failed to provide any evidence that there was no less restrictive alternative. *See Huntington Branch, NAACP*, 844 F.2d at 940.

The Fire District argues that even if there is an adverse impact, legitimate concerns for the safety of the public, the residents, and firefighters justify the "family" and "lodging and rooming house" provisions of the Fire Safety Code. Further, they argue that there are no less restrictive alternatives to accomplish those ends because these are "minimum" safety requirements. While these safety concerns are very legitimate and important concerns, defendant has failed to produce any evidence that there are, in fact, no less restrictive alternatives. For example, as

---

**25.** The Land Use Regulations of the City of West Haven provide in part:

The residential districts established in this resolution are designed to promote and protect the public health, safety, and general welfare. These regulations are intended to maintain the neighborhood integrity, protect property values, provide sufficient light and open space between buildings, prevent congestion of streets, regulate demand on public services and maintain control over the quality of the environment of the community. The regulations are also designed to provide sufficient room for growth and diversity of housing needs and styles to meet the needs of the community now and in the future.

Single–Family residential districts are designed specifically to maintain the integrity of the neighborhoods with regard to minimum and uniform lot sizes as well as the single-family characteristic.

West Haven Land Use Regulations § 2–1.

plaintiffs point out, Inspector Spreyer testified the elements of a fire-safe house are good organization, housekeeping, communication, and awareness of fire risks and prevention. The presence of these factors was never determined at Oxford House–Jones Hill. Plaintiffs have produced evidence that fire safety matters are discussed at the weekly house meetings; that there is substantial communication between the residents; that all rooms in the house are accessible to all residents. Contrary to defendant's assertion that a reasonable trier of fact could reach only one conclusion, *i.e.,* that there was no less restrictive alternative, we disagree and find that there is at least a genuine issue of material fact as to whether the safety measures imposed by the First Fire District, including the enclosed stair well, a second means of egress, an automatic sprinkler system, and enlarging all the windows, were the least restrictive alternative.

Therefore, based on the evidence of record, we deny defendants' motions for summary judgment as to plaintiffs' disparate impact claims of discrimination under the FHAA and ADA.

### F.  FAILURE TO PROVIDE A REASONABLE ACCOMMODATION UNDER THE FHAA AND ADA— RIPENESS

Plaintiffs' last theory of discrimination under the FHAA and ADA is based on defendants' failure to provide a reasonable accommodation by treating Oxford House–Jones Hill as a single-family residence which would allow it to continue to operate in its current condition. In several letters to the City and First Fire District, representatives of Oxford House, Inc., requested such an accommodation. However, based on the record before the Court, it is clear that neither Ms. Tsombanidis nor any of the John Doe plaintiffs ever pursued a variation or special use exception from the Board of Zoning Appeals or a variation or exemption from the State Building Inspector. Likewise, plaintiffs did not seek an exemption or variance of the Fire Safety Code from the State Fire Marshal. Defendants assert that they cannot be found to have failed in their obligation to make a reasonable accommodation necessary to afford the residents of Oxford House–Jones Hill an equal opportunity to live in a single-family residence because plaintiffs never availed themselves of the administrative procedures that would have allowed defendants to make such an accommodation, and it is premature to assume that the City or State Fire Marshal will deny plaintiffs the accommodations that they are seeking should they pursue the administrative avenues of relief available to them. Defendants assert that plaintiffs' failure to pursue these administrative avenues for relief is fatal to their reasonable accommodation claim—in other words, that plaintiffs' claim is not ripe for adjudication. Plaintiffs maintain, however, that this process requires public notice and a public hearing, which would subject them to unwanted and unwarranted scrutiny, and, therefore, they should not be required to exhaust these administrative remedies.

The ripeness doctrine is invoked to determine whether a dispute has matured to the point that warrants a judicial determination. 13A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure, Jurisdiction, 2d* § 3532 at 112 (1994). The doctrine is rested both upon the "case or controversy" requirement of Article III of the United States Constitution, as well as upon prudential policy considerations and concepts of federalism. *Id.* The central concern is whether there are uncertain or contingent future events that may not occur as anticipated that would render a judicial determination unnecessary. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430

U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

In *Oxford House–C v. City of St. Louis,* the Court held that plaintiff's claim against the City for failure to provide a reasonable accommodation in the application of its zoning regulations that limited the number of unrelated persons who could live together in a single-family district was not ripe for adjudication because the plaintiff had not applied for a variance from the statute. The Court held that the "Oxford Houses must give the City a chance to accommodate them through the City's established procedures for adjusting the zoning code.... The Fair Housing Act does not insulate the Oxford House residents from legitimate inquiries designed to enable local authorities to make informed decisions on zoning issues." 77 F.3d at 253 (internal citations and quotations omitted). The Court then held that Congress did not intend to remove handicapped people from participation in the public components of zoning decisions to the extent that participation is required of all citizens. "In our view, Congress also did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance." *Id.*

In *Oxford House–A v. City of University City,* 87 F.3d 1022 (8th Cir.1996), the Eighth Circuit held that a lawsuit filed by Oxford House challenging the City's single-family zoning provision (which defined family to include a group of three unrelated persons), was premature, where plaintiff had not attempted to exhaust local administrative zoning remedies before filing suit. Accordingly, the Court denied plaintiff's request for attorney's fees, finding that the suit was unreasonably filed.

In *United States v. Village of Palatine,* 37 F.3d 1230, 1233 (7th Cir.1994), the Seventh Circuit held that plaintiff's reasonable accommodation claim was not ripe for adjudication because the plaintiff had not requested a special use exception from the Village which would allow the Oxford House group home to operate in the single-family district. Until it did, the Court noted, the Village could not authorize the current use of the Oxford House facility. *Id.* at 1233. Thus, the Court held that before the plaintiff would have a ripe claim, the Village must be afforded an opportunity to make a reasonable accommodation pursuant to its own lawful procedures, unless it was clear that the result of such procedures is foredoomed.[26] *Id.* at 1234. The Court also addressed the same argument raised by plaintiffs in the instant case, *i.e.,* that requiring the Oxford House group home to utilize the procedures for obtaining special use approval was itself a failure on the part of the Village to make a reasonable accommodation to the needs of the handicapped due to the stigmatizing effect of the public scrutiny that would necessarily follow. That claim, the Court held, was ripe. Employing a balancing test, the Court held that the burden on the residents imposed by a public hearing did not outweigh the Village's interest in applying its facially neutral law to all applicants for a special use approval. Finding that the Village uniformly required a special use approval for all non-permitted uses, and that this process was not limited to the handicapped nor was it applied in a discriminatory manner, the Court held that the Village's procedures did not violate the FHAA. *Id.* at 1234. The Court noted that the plaintiffs did not need to follow these procedures if resort to them was manifestly futile. *Id.* However, the Court found that was not the case in light of the Village's "exemplary record in responding to the needs of handicapped individuals." *Id.*

In the instant case, it is undisputed that Oxford House–Jones Hill has not

26. In a footnote, the Court noted that if the plaintiff had brought an intentional discrimination claim, rather than a failure to make a reasonable accommodation, that claim "might well be presently ripe even though Oxford House–Mallard has not sought a special use approval." 37 F.3d at 1233, n. 3.

requested a special use permit, an exemption or variation from the Zoning Board of Appeals or from the State Building Inspector. Likewise, it has not requested an exemption or variance from the State Fire Marshal.[27] Until it does, neither the City nor the Fire District can authorize the current use of the property nor can they provide plaintiffs with the "reasonable accommodation" which they seek. Plaintiffs must give defendants an opportunity to accommodate them through the established procedures. Because plaintiffs may be granted the relief they seek through these channels, we find that their reasonable accommodation claims are not ripe for adjudication.[28]

Although these procedures may subject plaintiffs to undesired public scrutiny, we find, based on the caselaw cited above that plaintiffs must first pursue these avenues of relief before asserting a federal discrimination claim against these defendants for failure to accommodate, particularly given defendants' unrefuted assertions that they themselves do not have the authority to grant plaintiffs the accommodations they are seeking. It is not the function of this Court in the first instance to act as a zoning board of appeal to review the fact-intensive zoning issues presented by plaintiffs' accommodation request. Further, plaintiffs have not shown that it would be an exercise in futility to seek a special use exception. The local and State authorities that have been vested with the authority to decide these matters in the first instance should be given the opportunity to decide whether plaintiffs should be granted the reasonable accommodation they request before this Court is asked to review a claim for an alleged denial of a reasonable accommodation.

Accordingly, because we find that plaintiffs' discrimination claims under the FHAA and ADA for failure to provide a reasonable accommodation are not ripe for adjudication, the Court grants defendants' motion for summary judgment without prejudice to plaintiffs' reasserting these claims after they have pursued the available administrative remedies.

## H. VIOLATION OF THE EQUAL PROTECTION CLAUSE

Plaintiffs' final claim is asserted under 42 U.S.C. § 1983, for defendants' violation of the Equal Protection Clause by virtue of their unreasonable, arbitrary, and capricious discrimination against plaintiffs on the basis of their handicap. They further argue that this violation occurred pursuant to a municipal "policy or custom" because the actions of the City officials were overseen by the Mayor himself, as well as the Commissioner of Planning and Zoning. Likewise, the actions of the First Fire District were overseen by the State Fire Marshal.

██ The Equal Protection Clause of the Fourteenth Amendment prohibits

---

**27.** The First Fire District asserts that the local fire marshal does not have the authority to waive the State Fire Code. "No discretion is granted. Once a determination is made that an owner is violating the Code, the local official must order the abatement of the violation." (Fire District's Br. at 26) (citing Conn. Gen.Stat. § 29–306, which provides that "When the local fire marshal ascertains that there exists in any building . . . a condition in violation of the statutes relating to fire prevention or safety . . . he *shall order* . . . the conditions remedied by the owner or occupant. . . ."). The only provision for discretion in the enforcement of the Code is granted to the State Fire Marshal by Conn.Gen.Stat. § 29–296. *See* Note 16, *supra.*

**28.** The requirement that plaintiffs give defendants an opportunity to provide the reasonable accommodations that they seek by pursuing the local and state exemption and variance procedures is different than exhaustion of administrative remedies before HUD under the FHAA. The FHAA permits private enforcement of the Act "whether or not a complaint has been filed under section 3610(a) of this title. . . ." 42 U.S.C. § 3613(a)(2); *see Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township,* 996 F.Supp. 409 (D.N.J.1998). (Section 3610(a) sets forth the administrative complaint procedures before the Secretary of Housing and Urban Development.)

162

states from denying their citizens "the equal protection of the laws." U.S. Const. amend. XIV. This directive requires states to treat similarly situated persons similarly. In cases in which a government ordinance discriminates on its face against a non-suspect group of persons, courts are required to determine whether there is a rational relationship between the ordinance's classification and a legitimate governmental goal. *Pack v. Clayton County,* 1993 WL 837007, at \*8 (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 442–47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). However, in cases in which a governmental body is alleged to have unequally administered a facially neutral ordinance, the plaintiffs must show that there was intentional discrimination. *Id.*

We have already ruled that as to the First Fire District there is no evidence to support a claim of intentional discrimination. Therefore, we dismiss plaintiffs' section 1983 claim against the Fire District on that basis.

As to the City, we found genuine issues of material fact as to plaintiffs' claim of intentional discrimination. Therefore, we turn to the question of whether plaintiffs has presented evidence of a municipal "custom" or "policy" or of deliberate indifference to support their claim of municipal liability against the City. *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability cannot be based upon a theory of *respondeat superior.* Plaintiffs have failed to produce any evidence that the City of West Haven had a policy or custom of administering the zoning and building codes in a manner that discriminated against handicapped persons or of denying housing opportunities to individuals or groups because of their handicapped status. We find no evidence of other similar incidents by the City nor a pattern of misconduct. *See City of Canton v. Harris,* 489 U.S. 378, 385–87, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Accordingly, we grant defendants' motions for summary judgment as to plaintiffs' claims under section 1983.

### III. CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment of the First Fire District [**Doc. # 44**] is GRANTED as to plaintiffs' claims for intentional discrimination and failure to provide a reasonable accommodation under the FHAA and ADA. It is also GRANTED as to plaintiffs' claims under 42 U.S.C. § 1983. It is DENIED as to plaintiffs' claim of disparate impact discrimination under the FHAA and ADA. The Motion for Summary Judgment of the City of West Haven [**Doc. # 63**] is GRANTED as to plaintiffs' claims for failure to provide a reasonable accommodation under the FHAA and ADA and as to plaintiffs' claims under 42 U.S.C. § 1983. It is DENIED as to plaintiffs' claims of intentional discrimination and adverse impact discrimination under the FHAA and ADA.

SO ORDERED.