STATE of Wisconsin EX REL. Reginald C. BRUSKEWITZ,
Plaintiff-Appellant,

v.

CITY OF MADISON and/or Common Council of the
City of Madison, Defendants-Respondents.

Court of Appeals

*No. 00–2563. Submitted on briefs April 18, 2001.—Decided
September 20, 2001.*

·2001 WI App 233

(Also reported in 635 N.W.2d 797.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *George B. Strother, IV* of *Krekeler Law Office, S.C.* of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Eunice Gibson*, city attorney, and *James L. Martin*, asst. city attorney of Madison.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. VERGERONT, P.J.    Reginald Bruskewitz appeals the order of the trial court affirming the decision of the City of Madison Common Council to grant a conditional use permit to Tellurian UCAN, Inc. for a community living arrangement (CLA) for adolescent boys in the juvenile justice system. He contends that the Common Council acted arbitrarily and unreasonably in basing its decision on an erroneous interpretation of the Fair Housing Amendments Act (FHAA) and the Americans with Disabilities Act (ADA), and that neither of these acts required the Common Council to grant the conditional use permit. He also contends that the Common Council acted contrary to law because Tellurian failed to meet the criteria for a conditional use permit.

¶ 2.    We conclude that, even though some of the proposed residents may have a handicap or disability within the meaning of those statutes, the FHAA and the ADA do not require that the City provide a reasonable accommodation because the residents are not living in a CLA because of those handicaps or disabilities. Because it appears that the Common Council's understanding of the FHAA and the ADA was a significant factor in its decision, and because we do not agree with Bruskewitz that we can decide as a matter of law that Tellurian did not meet the criteria for a conditional use permit, we conclude that the appropriate course is a remand to the Common Council. We therefore reverse and remand to the circuit court, with directions that it reverse and remand to the Common Council and instruct the Common Council to determine whether Tellurian meets the standards for a conditional use permit without regard to a reasonable accommodation based on handicap or disability.

300

## BACKGROUND

¶ 3.   The house which Tellurian seeks to occupy as a CLA is located at 5315 Old Middleton Road in the Crestwood residential neighborhood. This house had been in use as a CLA for much of the time since 1981—as a group home for eight mentally, emotionally, and developmentally handicapped adults, and a community-based residential facility for six adults with visual impairments and mental or emotional disorders. Tellurian wishes to operate a CLA there for up to eight adolescent boys between the ages of fifteen to eighteen. Because the house is within 2,500 feet from another CLA, Tellurian had to apply for a conditional use permit to occupy the house as a CLA.[1] Tellurian is licensed by

---

[1] WISCONSIN STAT. § 62.23(7)(i)3 (1999–2000) provides that a CLA with a capacity for eight or fewer persons being served and properly licensed may be located in any residential district. However, § 62.23(7)(i)1 provides:

(i) *Community and other living arrangements.* For purposes of this section, the location of a community living arrangement, as defined in s. 46.03(22), a foster home, as defined in s. 48.02(6), a treatment foster home, as defined in s. 48.02(17q), or an adult family home, as defined in s. 50.01(1), in any city shall be subject to the following criteria:

1. No community living arrangement may be established after March 28, 1978 within 2,500 feet, or any lesser distance established by an ordinance of the city, of any other such facility. Agents of a facility may apply for an exception to this requirement, and such exceptions may be granted at the discretion of the city. Two community living arrangements may be adjacent if the city authorizes that arrangement and if both facilities comprise essential components of a single program.

Initially, Tellurian sought and was granted an occupancy permit to occupy this house as a CLA for federal inmates on release programs. Bruskewitz filed an action seeking to enjoin Tellurian from operating that CLA on the ground that it would

the Wisconsin Department of Health and Family Services (DHFS) to operate a CLA for adolescent boys under WIS. STAT. § 48.60 through WIS. STAT. § 48.77 (1999–2000) and has been doing so in the City of Monona for three years. DHFS directed Tellurian to find a neighborhood setting for the program, and that is why Tellurian sought to relocate to Crestwood.

¶ 4. At the time of the application, about fifty boys had previously participated in this program. About 80% had been referred by the Wisconsin Department of Corrections (DOC). A court had determined that these boys had violated a criminal statute and placed them in a correctional facility, and they now had the opportunity to serve the time remaining at Tellurian or another similar program rather than at the correctional facility. The remaining 20% had been referred by Dane County Human Services: they had either been adjudicated delinquent but were not placed in a correctional facility, or they had been removed from their homes as children in need of protection and services (CHIPS).[2] The purpose of the program is to teach the boys the skills

violate WIS. STAT. § 62.23(7)(i)1 because Madison did not have an ordinance that established a lesser distance. We agreed, and affirmed the trial court's granting of an injunction. *Bruskewitz v. Tellurian, Inc.*, No. 98–2531 (Wis. Ct. App. July 8, 1999). Since the time Bruskewitz first filed that action, Madison adopted an ordinance, MADISON, WIS., ZONING CODE § 28.08(2)(b)11.c (1998), which requires a conditional use permit before a CLA serving not more than eight people may locate within 2,500 feet from another CLA.

[2] According to the testimony of Tom Groth, the supervisor of the program, the CHIPS cases were either initiated by the county because the youth was in jeopardy due to alcohol, sexual, or physical abuse in his home, or the youth's parents initiated the case because their child was uncontrollable.

necessary to live independently and successfully: most will not be returning to their parents' home, but will be living on their own when they leave Tellurian. The boys are required to either be in high school (if they have not completed high school or their GED) and working twenty hours a week or be working full time. They are expected to learn to find and keep employment, manage their money, perform the domestic tasks necessary for independent living, and look for and obtain apartments or other living arrangements and be successful tenants. The average length of stay is between three to six months, with eight months as the longest stay. The boys are supervised by either one or two staff members at all times.

¶ 5. The City of Madison Plan Commission held a hearing on Tellurian's application to determine if it met the standards for a conditional use permit.[3] Numerous persons spoke both for and against the application and

---

[3] The pertinent standards are MADISON, WIS., ZONING CODE § 28.12(11)(g)1, 2 and 7:

1. That the establishment, maintenance or operation of the conditional use will not be detrimental to or endanger the public health, safety, comfort or general welfare.

2. That the uses, values and enjoyment of other property in the neighborhood for purposes already established shall be in no foreseeable manner substantially impaired or diminished by the establishment, maintenance or operation of the conditional use.

. . . .

7. That when applying the above standards to an application by a community living arrangement the City Plan Commission shall:

a. Bear in mind the City's general intent to accommodate community living arrangements.

submitted written letters and other documents. The negative comments were primarily from neighbors who either had concerns about safety issues given the juvenile offender status of most of the boys or had concerns about Tellurian's management and community relations.

¶ 6. In the materials Tellurian submitted, Tellurian asserted that prior and present participants in the program had learning disabilities, developmental disorders, psychological disorders, and past drug and alcohol addictions. Tellurian argued that this required the commission to consider its application under the FHAA and the ADA, although it also asserted that, even without reference to those statutes, it met the standards for granting the conditional use permit. The plan commission voted to refer the matter to the city attor-

---

b. Exercise care to avoid an over-concentration of community living arrangements which could create an institutional setting and seriously strain the existing social structure of a community. Considerations relevant for this determination are:

i. The distance separating the proposed community living arrangement from other such facilities.

ii. The capacity of the community living arrangement and the percent the facility will increase the population of the community.

iii. The total capacity of all the community living arrangements in the community.

iv. The impact on the community of other community living arrangements.

v. The success or failure of integration into communities of other community living arrangements operated by the individual or group seeking the conditional use permit.

vi. The ability of the community to meet the special needs, if any, of the applicant facility.

ney for an opinion on whether the FHAA and the ADA were applicable, and, if so, what they required. The city attorney prepared a written opinion stating that: (1) information submitted to the plan commission supported the conclusion that the boys proposed to be housed in the CLA had histories of drug and alcohol abuse, developmental disabilities, and psychological disorders, which were "handicaps" and "disabilities" within the meaning of the FHAA and the ADA; (2) a reasonable accommodation must therefore be provided; (3) granting the application would constitute a reasonable accommodation unless to do so would constitute a "direct threat" to public health or safety; and (4) no "direct threat" had been demonstrated at the public hearing.

¶ 7. After reconvening to hear additional speakers and receive additional written comment, the plan commission voted to deny Tellurian's application. It noted the number of residents who had run away from the facility and it found the situation detrimental to the public health, safety, comfort, and general welfare. It also found that Tellurian had not demonstrated that a conditional use permit would not substantially impair or diminish the uses, values, and enjoyment of other property in the neighborhood for purposes already established, noting the testimony on the impact of the proposed CLA on property values and on the ability of an adjoining apartment owner to rent apartments.

¶ 8. Tellurian appealed the decision to the Common Council, which conducted a public hearing. After hearing and questioning the speakers and receiving written comment, the Common Council went into closed session to consult with the city attorney. After that consultation, the Common Council voted to refer the matter to the planning unit staff for a meeting with

305

representatives of the neighborhood and of Tellurian. They were to decide upon a method for determining whether the boys who would be living in the CLA would be disabled or handicapped within the definition of the federal statutes. A physician was retained to make that determination. He reviewed the medical files of former participants in the program and concluded that approximately twelve subjects had a disability within the statutory definition he had been given, and he could not find enough evidence in the other files to substantiate the presence of a disability meeting that definition. He also reviewed the files of the current eight participants and concluded that "it appears as if 'disability' per the definition given could be established in three cases, with an additional case being somewhat marginal." The files which the physician determined supported a conclusion of a disability showed personality, psychological or conduct disorders, learning disabilities, drug or alcohol dependency, depression, or some combination of those.

¶ 9. After receiving this report, the city attorney opined in a memorandum to the Common Council that, although no case law had addressed whether a reasonable accommodation had to be made when some but not all of the proposed residents have disabilities, in her view a reasonable accommodation would be required under these circumstances. The Common Council reconvened, listened to more speakers and questioned the planning unit staff and the city attorney. It then voted to reverse the plan commission and grant the conditional use permit, with conditions on the number of residents, vehicles, staff persons, and a requirement for motion lights and fencing.

¶ 10. Bruskewitz, who lives near the proposed CLA, sought certiorari review of the Common Council's

decision in the circuit court. The circuit court affirmed the Common Council's decision, concluding that there was substantial evidence to support its decision that the standards for a conditional use permit were met.

## DISCUSSION

■

¶ 11. On certiorari review, we are limited to determining whether: (1) the governmental body's decision was within its jurisdiction, (2) the body acted according to law, (3) the decision was arbitrary or oppressive, and (4) the evidence of record substantiates its decision. *State ex rel. Ortega v. McCaughtry*, 221 Wis. 2d 376, 385, 585 N.W.2d 640 (Ct. App. 1998). We apply these standards de novo to the Common Council's decision, reviewing that decision and not the decision of the circuit court. *Kapischke v. County of Walworth*, 226 Wis. 2d 320, 327, 595 N.W.2d 42 (Ct. App. 1999).

¶ 12. We address first Bruskewitz's contention that the Common Council acted arbitrarily and unreasonably because it based its decision on an erroneous interpretation of the FHAA and the ADA. The FHAA, 42 U.S.C. § 3604 (1994), provides that it is unlawful:[4]

> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of –
>
> > (A) that buyer or renter,
> >
> > (B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
>
> . . . .

---

[4] Because the City does not argue that any protected class under the FHAA other than that of handicap is involved, we confine our analysis under the FHAA accordingly.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of –

(A) that person; or

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

. . . .

(3) For purposes of this subsection, discrimination includes –

. . . .

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. . . .

¶ 13.  Under 42 U.S.C. § 3602(h) (1994), "handicap" is defined as:

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such and impairment, or

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance.[5] (Footnote added.)

---

[5] "Handicap," as used in the FHAA, is further defined in the Code of Federal Regulations, 24 C.F.R. § 100.201(a)(2) (2001), as:

¶ 14. The ADA, 42 U.S.C. § 12132 (1994), provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The definition of "disability" under the ADA is substantially the same as that of "handicap" under the FHAA. 28 C.F.R. § 35.104 (2001). The ADA, similar to the FHAA, requires "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service." 28 C.F.R. § 35.130(b)(7) (2001).

¶ 15. Both the FHAA and the ADA apply to zoning regulations, practices, or decisions that subject persons with handicaps or disabilities to discrimination based on their handicap or disability. *Tsombanidis v. City of West Haven, Conn.*, 129 F.Supp. 2d 136, 155–156 (D. Conn. 2001). For purposes of this decision, the legal

---

Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term *physical or mental impairment* includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

analysis under both statutes are the same and thus we will consider them together.[6]

¶ 16. Bruskewitz makes two challenges to the interpretation of the FHAA and the ADA that the city attorney presented to the Common Council. First, he disputes that Tellurian has established that any of the proposed residents has a disability within the meaning of the FHAA or the ADA because, he asserts, the physician's conclusions on those files are phrased in equivocal language. Second, he contends that the FHAA and the ADA proscribe discrimination based on a disability, and there is no showing that a negative animus toward persons with disabilities was the basis for the plan commission decision or the opposition to Tellurian's application. Nor is there a showing that a reasonable accommodation is necessary to afford the residents "an equal opportunity to use and enjoy a dwelling." Even if three out of eight residents do have a disability within the meaning of the statutes, Bruskewitz contends they are living in a CLA not because they are disabled but because they are juvenile delinquents in need of training in social skills and personal and social responsibility.

██

¶ 17. We will assume without deciding that the record is sufficient to show that three out of the eight proposed residents have a disability within the meaning of the FHAA and the ADA and we will focus on the second issue Bruskewitz raises. We agree with Bruskewitz that both the FHAA and the ADA proscribe discrimination based on a disability. Therefore, even if

---

[6] Unless otherwise indicated, when either "handicap" or "disability" is used alone in this opinion, it also encompasses the other term.

some of the proposed residents have a disability within the meaning of those statutes, only actions that discriminate against them based on those disabilities are proscribed. There are three ways to show discrimination under the statutes: (1) intentional discrimination, (2) discriminatory impact, and (3) refusal to make a reasonable accommodation. *Tsombanidis*, 129 F.Supp. 2d. at 150–51. The City's concern with violating the statutes relates to the obligation to provide a reasonable accommodation.

¶ 18. The reason Tellurian had to apply for a conditional use permit was because of the 2,500 foot requirement. The city attorney's position as communicated to the plan commission and the Common Council, as well as the City's position on this appeal, is that, since some of the proposed residents have a disability that meets the definition of the federal statutes, the City must make a reasonable accommodation for any application for a CLA within which those individuals will reside, regardless of the relationship between the disabilities and the individuals' needs for a CLA. The reasonable accommodation that is required, in the City's view, is the application of a more favorable standard than that ordinarily applied to decide if a conditional use should be permitted in spite of the distance requirement: the conditional use should be permitted unless there is evidence that the proposed CLA would constitute "a direct threat to the health or safety of other individuals or . . . would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9).[7]

---

[7] 42 U.S.C. § 3604(f)(9) provides in full:

Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct

311

¶ 19.   We agree with Bruskewitz that the City's analysis lacks a necessary connection between the disability of the proposed residents and the 2,500 foot requirement. Under the FHAA, a refusal to make a reasonable accommodation is only discrimination when the accommodation is necessary to "afford *such person* equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B) (emphasis added). "Such person" refers to the "person" discriminated against "because of a handicap" in paragraph 2. 42 U.S.C. § 3604(f)(2). Read together, these two provisions state that when a rule, policy, practice, or service prevents a person with a disability from having an opportunity to use and enjoy a dwelling equal to that which persons without that disability have, then the failure to make a reasonable accommodation is discrimination based on a disability. Similarly, under the ADA a reasonable modification is required when "necessary to avoid discrimination *on the basis of disability*." 28 C.F.R. § 35.130(b)(7) (emphasis added).

■

¶ 20.   Case law applying the reasonable accommodation provision has defined "equal opportunity" as including the right of handicapped individuals to choose to live in single-family residential neighborhoods. *Smith & Lee Assoc., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 794–95 (6th Cir. 1996). The requirement that the accommodation be "necessary" means that, but for the proposed accommodation, the handicapped individual will likely be denied an opportunity equal to that of persons who are not handicapped to enjoy the housing of his or her choice. *Id.* at 795; *see also Oconomowoc*

---

threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

*Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 957 (E.D. Wis. 1998) (" '[N]ecessary' . . . [means] a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary.' ").

■■■■

¶ 21.   The duty to accommodate is shaped by the nature of the particular handicap. *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301–02 (2d Cir. 1998). In particular, persons with certain handicaps may need to live together in order to share personnel and to reinforce each other's efforts in creating and maintaining a home. *Id.* at 302; *see also Brandt v. Village of Chebanse, Ill.*, 82 F.3d 172, 174 (7th Cir. 1996) (joint living arrangements are essential for certain groups of handicapped persons who seek to live together for mutual support or to permit full-time care by a staff person). When disabled persons are not able to live independently because of their disability, a group living arrangement with caretakers is one mode of ameliorating the effects of their disability because it enables them to live in a residential setting rather than in an institution. *Oconomowoc Residential Programs*, 23 F.Supp. 2d at 958. A zoning regulation that restricts or prevents group living arrangements in residential neighborhoods, when applied to persons who need to live in such an arrangement because of their disability, thus results in an unequal opportunity for those persons to live in single-family neighborhoods as compared to persons who do not need to live in a group arrange-

ment in order to enjoy a single-family residential neighborhood. *Id.* at 958–59; *Smith & Lee*, 102 F.3d at 795–96.

¶ 22. This court has previously considered the 2,500 foot requirement in the context of the application for permission to build an eight-bed community-based residence for elderly handicapped. *"K" Care, Inc. v. Town of Lac du Flambeau*, 181 Wis. 2d 59, 63, 510 N.W.2d 697 (Ct. App. 1993).[8] In that case, the town denied the application for an exception to the 2,500 foot distance requirement. We first concluded that the proposed residents, who had various physical and mental infirmities, were handicapped within the meaning of the FHAA, observing that they were "unable to eat, bathe, walk or use a toilet without assistance. In short, they are no longer able to live independently," although none required skilled nursing care. *Id.* at 67. We then concluded that the town had discriminated by failing to make a reasonable accommodation because the evidence did not support the town's rationale—that granting an exception would undermine the purpose of Wis. Stat. § 62.23(7)(i)1—and there was no evidence that allowing this home would impose any burden or expense on the town in any way. *Id.* at 68–70. The purpose of the statute, we explained, was to restrict the density of CLAs in residential neighborhoods in order

---

[8] We also considered the 2,500 feet distance requirement in *Tellurian U.C.A.N., Inc. v. Goodrich*, 178 Wis. 2d 205, 208, 504 N.W.2d 342 (Ct. App. 1993). There a village had denied an exception to the requirement for a group home for mentally ill persons. We upheld the trial court's finding that the village did not intentionally discriminate against the mentally handicapped, but we held that the village failed to make a reasonable accommodation because there was no evidence of any adverse impact if the exception were allowed. *Id.* at 215–17.

to preserve the established character of the neighborhood so that residents of the facility "could live in a normal residential setting in a manner similar to other residents of the area rather than in an institutionalized setting." *Id.* at 69.

¶ 23.   We did not expressly state in "*K*" *Care* that a reasonable accommodation was required because the proposed residents were not able to live independently due to their disabilities, and the application of the 2,500 foot requirement thus resulted in an unequal opportunity to live in a single-family residential area. It may be that our failure to expressly state this was misleading to the city attorney here. However, we are satisfied that this was the basis for our conclusion that a reasonable accommodation was necessary, and that, consistent with the case law we have discussed above, the obligation to make a reasonable accommodation to the distance requirement arises only when the proposed residents need to live in a CLA because of their disabilities.

■

¶ 24.   Turning to the record in this case, we see no evidence that the proposed residents of the CLA need to live in a CLA because of their disabilities. Indeed, the evidence from the DOC was that it did not make referrals to Tellurian based on disabilities, but rather based on whether a youth is eligible to leave a correctional institution and has the need for independent living skills to reintegrate into the community. There is also no evidence that the boys referred by Dane County Human Services were either removed from their homes or placed at Tellurian because they could not live in a single-family home because of their disability. Finally, although the boys in Tellurian's program may receive treatment for mental health problems from outside providers, the purpose of the program is not to treat the

boys' mental health problems; the purpose is to teach them the skills and the personal and social responsibility they need to live independently and successfully.

¶ 25. The City has brought to our attention no case in which a reasonable accommodation to a restriction on a CLA was required when the proposed residents were *not* persons who were not able to live independently because of their disabilities. And in the many cases we have examined in which a reasonable accommodation was required by the court, the proposed residents were persons who needed to live in a CLA because of their disability. This includes the cases from this court and the Wisconsin federal courts that have considered the 2,500 foot requirement at issue in this case: *Oconomowoc Residential Programs*, 23 F.Supp. 2d 941 (community based residential facility for developmentally disabled adults); *United States v. Village of Marshall*, 787 F.Supp. 872 (W.D. Wis. 1991) (group residential facility for persons suffering from mental illness); *Tellurian U.C.A.N., Inc. v. Goodrich*, 178 Wis. 2d 205, 504 N.W.2d 342 (Ct. App. 1993) (group home for mentally ill persons); *"K" Care*, 181 Wis. 2d 59. It also includes cases from other jurisdictions that have required reasonable accommodations to similar and other types of zoning regulations or decisions. *See, e.g., United States v. City of Chicago Heights*, 161 F. Supp. 2d 819 (N.D. Ill. 2001) (group home for persons with mental illness aided by professional staff); *Smith & Lee*, 102 F.3d 781 (group home for elderly disabled who require ongoing supervision); *Thornton v. City of Allegan*, 863 F.Supp. 504 (W.D. Mich. 1993) (adult foster care facility for mentally handicapped persons); *Horizon House Developmental Servs., Inc. v. Township of Upper Southampton*, 804 F.Supp. 683 (E.D. Pa. 1992)

(group home for persons with mental retardation), *aff'd without opinion,* 995 F.2d 217 (3d Cir. 1993).

¶ 26.   We conclude that because the proposed residents are not living in a CLA because of their disabilities, the City is not obligated to make a reasonable accommodation to Tellurian in the application of the 2,500 foot requirement. That is, the City has no obligation to do anything other than apply the standards for a conditional use permit in the same way it would if none of the proposed residents had a disability. Bruskewitz argues that had the Common Council done this, it could only have concluded that the standards for the permit were not met, and he asks us to reverse for that reason. However, we cannot say as a matter of law that this is the case. Neither can we say, based on our reading of the transcript, that the Common Council would have made the same decision—to grant the conditional use permit—had it not been advised that the FHAA and the ADA required a reasonable accommodation. The question whether the proposed residents had disabilities within the meaning of the statutes, and, if so, what effect that had on the standard the Common Council was to apply, was the focus of a significant portion of the discussion.

¶ 27.   Therefore, we cannot agree with the City's implicit suggestion that we review the record to determine whether the evidence supports granting the permit without regard to the FHAA and the ADA. We are persuaded that the proper course is to reverse and remand to the circuit court with directions that it reverse and remand to the Common Council. The circuit court shall instruct the Common Council to consider Tellurian's application for a conditional use permit by applying the standards for a conditional use permit under MADISON, WIS., ZONING CODE

317

§ 28.12(11)(g)1, 2 and 7 without regard to a reasonable accommodation based on handicap or disability.

*By the Court.*—Order reversed and cause remanded with directions.