COURT OF APPEALS
DECISION
DATED AND FILED

**February 24, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If
published, the official version will appear in
the bound volume of the Official Reports.

A party may file with the Supreme Court a
petition to review an adverse decision by the
Court of Appeals. *See* WIS. STAT. § 808.10
and RULE 809.62.

Appeal No.     **2021AP563**

STATE OF WISCONSIN

Cir. Ct. No.  2020CV837

IN COURT OF APPEALS
DISTRICT IV

SANDRA SANDOVAL,

PLAINTIFF-APPELLANT,

V.

MADISON EQUAL OPPORTUNITIES COMMISSION AND
CAPITOLAND CHRISTIAN CENTER CHURCH, INC.,

DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Dane County:
VALERIE BAILEY-RIHN, Judge.  *Affirmed*.

Before Kloppenburg, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent
or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Sandra Sandoval appeals a circuit court order that affirmed a decision of the Madison Equal Opportunities Commission. Sandoval asserts that the Commission erroneously denied her employment discrimination claims against Capitoland Christian Center Church, Inc. We disagree and affirm.

## BACKGROUND

¶2 Sandoval was employed as a cook by Capitoland, a nondenominational church that operates a daycare and an early elementary school. At the time she applied for the position, Sandoval was required to sign a "Statement of Affirmation and Agreement," which we refer to as "the Agreement." The Agreement provided that, among other things, Sandoval would refrain from "co-habitation with members of the opposite gender outside of marriage" as a condition of her employment.

¶3 Several months later, the director of the daycare learned that Sandoval was in fact cohabitating with her male partner, to whom she was not married. Following a discussion between Sandoval and the director, Sandoval ceased to be employed by Capitoland. The parties dispute whether Sandoval voluntarily resigned, or whether Capitoland terminated her employment.

¶4 Sandoval filed a complaint with the Commission, which is charged with enforcing the City of Madison Equal Opportunities Ordinance (hereinafter, the "Equal Opportunities Ordinance"). MADISON, WIS., CODE OF ORDINANCES § 39.03(10)(b)4. (through January 2022).[1] She alleged that Capitoland terminated

---

[1] All references to the MADISON, WIS., CODE OF ORDINANCES are to the online version (last updated January 12, 2022), available at https://library.municode.com/wi/madison/codes/code_of_ordinances.

her employment based on her marital status, among other things, and that the termination and the terms and conditions of employment violated the Equal Opportunities Ordinance.[2] As discussed below, marital status is a protected class under § 39.03 of the Equal Opportunities Ordinance.

¶5 The Commission investigated the complaint and issued an initial determination. In its initial determination, the Commission found probable cause to believe that Capitoland unlawfully terminated Sandoval's employment due to her membership in a protected class and that the terms and conditions of Sandoval's employment violate the Equal Opportunities Ordinance.

¶6 A hearing examiner for the Commission held an evidentiary hearing on Sandoval's claims in January 2017. Sandoval, Brenda Van Rossum (the daycare's director), and Samuel Jake Stauffacher (the pastor who oversees the daycare's operations) testified at the hearing. The following facts are taken from the hearing transcript and exhibits and are undisputed unless otherwise noted.

¶7 Sandoval originally applied for the open position as a cook at Capitoland's daycare in August 2014. Capitoland offered Sandoval the position, which she accepted. As with all of Capitoland's employees and volunteers, she was required to and did sign the Agreement during the application process.

---

[2] During the proceedings before the Commission, Sandoval also alleged that Capitoland discriminated against her based on her sex, ethnicity, and national origin. She further alleged that Capitoland unlawfully retaliated against her when it asserted in her personnel file that she had resigned, and "through [its] unwillingness to settle" and make her "whole." Sandoval does not make any arguments on appeal regarding the Commission's decision to deny these claims, and we address them no further.

¶8     At the time Sandoval was hired, Capitoland knew that Sandoval was unmarried and had a daughter.  Sandoval did not tell Capitoland about the details of her living situation, and Capitoland did not ask her any questions about it.  At all times pertinent to this matter, Sandoval lived with her longtime male partner, as well as her daughter, her uncle, and her brother.

¶9     Sandoval worked for Capitoland for the following months without any performance or disciplinary issues.  Capitoland had "no complaints at all" about Sandoval, and "only good things were always said about her."

¶10     Capitoland holds a Christmas party each winter for the benefit of its employees and their families.  On January 15, 2015, the day before the party, Sandoval spoke with Van Rossum about bringing her partner.  Van Rossum stated that employees could only bring their spouses and children.  According to Van Rossum, Sandoval responded to the effect that she and her partner had been living together long enough that they were "pretty much married."  Sandoval ultimately attended the party without her partner.

¶11     On the day of the Christmas party, January 16, 2015, Van Rossum informed Stauffacher of her discussion with Sandoval.  Stauffacher said that the situation would have to be addressed, and he instructed Van Rossum to look into the situation and report back to him.  Van Rossum testified that, during this discussion with Stauffacher, the possibility of terminating Sandoval "wasn't even discussed."

¶12     On Monday, February 16, 2015, Van Rossum had a follow-up conversation with Sandoval about her living situation.  Van Rossum's and Sandoval's accounts of the February 16 conversation largely align, although Van Rossum's account was more detailed than Sandoval's account and, as we

recount in the following paragraphs, they disagreed about whether Capitoland terminated Sandoval's employment on that date.

¶13    Van Rossum provided the following testimony about the February 16 conversation. She met with Sandoval at the end of her shift and said that Capitoland could not have its "employees living with each other outside of marriage." According to Van Rossum, the first thing Sandoval said was, "it's okay, I'll be done then." Van Rossum told Sandoval that she did not want Sandoval to make a decision at that time, and that she would "touch base" with Stauffacher and they would "go from there." Van Rossum "encouraged [Sandoval] to come back the next day and to not just resign on the spot like that." Van Rossum testified that, because Sandoval was a good employee, she "was hopeful for answers" about "exactly what [Sandoval's] arrangement was" and whether it conflicted with the Agreement. However, they "didn't get around to discussing that" because Sandoval "kept saying" something to the effect of "'no, that's okay, I'll be done.' And it didn't seem like she wanted to discuss it." Van Rossum did not tell Sandoval that she was fired. Sandoval said she would come back the next day, which would be her last day. However, the following morning, Sandoval called and said that she would not be coming in to work.

¶14    Sandoval provided the following testimony about the February 16 conversation. Van Rossum informed Sandoval that she was in violation of the Agreement and that Van Rossum would have to talk to Stauffacher further about the situation. Sandoval acknowledged that Van Rossum asked her to return to Capitoland the following day. Sandoval testified: "[Van Rossum] told me that I was needed to help her, but how was I going to go back to work? I was already fired."

¶15    It is undisputed that Sandoval called Capitoland the morning of Tuesday, February 17, 2015, indicating that she would not be coming in to work. Sandoval was also scheduled to work on February 18, 19, and 20, but she did not come to work those mornings, either, nor did she call in to say that she would not be coming in.  According to Van Rossum, if Sandoval had not resigned, her employment would have been terminated for being a "no show" at work on February 18, 19, and 20.[3]

¶16    On Friday, February 20, 2015, Sandoval returned to Capitoland to hand in her key card and other items to Van Rossum.  As discussed below, the parties generally agree on the contents of the conversation that took place that day.[4]  Sandoval testified that Van Rossum "told me that I could not return to work unless I got married, and if I didn't, I could not return to work."  Sandoval testified that, although Van Rossum did not specifically tell Sandoval on February 20 that changing her "living situation" would also "address Capitoland's concerns," Sandoval understood that to be the case.

¶17    Following the January 2017 evidentiary hearing, the parties filed post-trial briefing and proposed findings of fact, and the hearing examiner issued a written decision in May 2019.

--------

[3] The hearing examiner found that Sandoval was also a "no show" on February 17, 2015, but this finding is contradicted by the record.  Specifically, Van Rossum testified that, under Capitoland's policy, Sandoval would not be considered a "no call, no show" on February 17 because she called in to work that morning.  The parties do not mention this discrepancy in their briefing, and it does not affect our analysis.

[4] Sandoval recorded her February 20, 2015 interaction with Van Rossum on her cell phone but, as discussed below, the examiner did not admit the recording or a transcript of the recording into evidence.

¶18 In his decision, the hearing examiner determined that Sandoval voluntarily resigned her employment "by not returning to work after February 16, 2015." As the hearing examiner explained, "[Sandoval's] employment was not terminated by [Capitoland] on or after February 16, 2015, though it might have been in the future." We discuss the basis of this finding, and its significance to the issues on appeal, at greater length in the discussion section below.

¶19 Additionally, the hearing examiner concluded that the no cohabitation clause in the Agreement is not a discriminatory term or condition of employment and does not violate the Equal Opportunities Ordinance. We recount the reasons the hearing examiner provided as needed below.

¶20 Finally, the hearing examiner declined to address several additional claims that Sandoval advanced in her post-trial briefing, having concluded that Capitoland lacked notice of these additional claims.

¶21 Sandoval appealed to the Commission, which affirmed the hearing examiner's decision and adopted it as its own. Sandoval then sought certiorari review in the circuit court pursuant to WIS. STAT. § 68.13 (2019-20).[5] The circuit court affirmed the Commission's decision, and Sandoval appeals.

---

[5] *See* MADISON, WIS., ORDINANCES § 39.03(10)(c)4 (providing that final orders of the Commission are subject to certiorari review pursuant to WIS. STAT. § 68.13). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

7

**DISCUSSION**

¶22    On certiorari review, we review the decision made by the Commission, not the decision of the circuit court.[6] ***State ex rel. Bruskewitz v. City of Madison***, 2001 WI App 233, ¶11, 248 Wis. 2d 297, 635 N.W.2d 797.   Our review is limited to:   (1) whether the Commission was within its jurisdiction; (2) whether the Commission acted according to law; (3) whether the Commission's actions were arbitrary, oppressive, or unreasonable; and (4) whether the evidence was such that the Commission might reasonably make the order or determination in question.  ***Ottman v. Town of Primrose***, 2011 WI 18, ¶35, 332 Wis. 2d 3, 796 N.W.2d 411.

¶23    We will sustain the Commission's findings of fact if they are supported by any reasonable view of the evidence.  ***Id.***, ¶53; *see also* ***Koenig v. Pierce Cnty. Dep't of Human Services***, 2016 WI App 23, ¶13 n.5, 367 Wis. 2d 633, 877 N.W.2d 632 (referring to this test as the "substantial evidence test"). Whether the facts in a particular case fulfill a particular legal standard is a question of law, which we review de novo.  ***Ottman***, 332 Wis. 2d 3, ¶54.

¶24    In this case, Sandoval argues that:    (1) the Commission's determination that Sandoval voluntarily resigned her employment with Capitoland was erroneous; (2) the hearing examiner should have admitted into evidence an audio recording of the February 20, 2015 conversation; (3) the Commission

---

[6] Certiorari is a mechanism by which a court may test the validity of a decision rendered by a municipality (among other tribunals).  ***Acevedo v. City of Kenosha***, 2011 WI App 10, 331 Wis. 2d 218, ¶8, 793 N.W.2d 500 (Ct. App. 2010).  Here, because the Commission adopted the hearing examiner's written decision as its own, we refer to that written decision as the Commission's decision.

erroneously determined that the no cohabitation provision of the Agreement does not violate the Equal Opportunities Ordinance; and (4) the Commission should not have dismissed her claim about Capitoland's Christmas attendance policy. We address each argument in turn.

## I. The Discriminatory Termination Claim

¶25 The parties agree that, to establish her employment discrimination claim, Sandoval must prove that: (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the adverse action was causally related to her membership in the protected class. *See, e.g.*, ***Puetz Motor Sales, Inc. v. LIRC***, 126 Wis. 2d 168, 172-73, 376 N.W.2d 372 (Ct. App. 1985); ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 802-03 (1973).

¶26 In this case, there is no dispute that the first two elements are met. As the Commission explained, marital status is a protected class pursuant to § 39.03 of the Equal Opportunities Ordinance, and Sandoval is a member of a protected class by virtue of being unmarried. It is also undisputed that Sandoval's job performance was satisfactory. The disputed issue is whether Sandoval has established that she was subject to an "adverse employment action."

¶27 Termination of employment is an adverse employment action. By contrast, if an employee was not terminated and instead resigned, there is no adverse employment action unless the circumstances are such that the resignation amounts to a constructive discharge. *See **Strozinsky v. School Dist. of Brown Deer***, 2000 WI 97, ¶¶66, 68, 237 Wis. 2d 19, 614 N.W.2d 443. Whether an employee resigned, was terminated, or was constructively discharged is a question of fact for the factfinder—here, the Commission. *Id.*, ¶78. The issue we must

9

determine is whether there is substantial evidence to support the Commission's findings that Sandoval voluntarily resigned and that her employment was not terminated or constructively discharged.

¶28 We first conclude that substantial evidence supports the Commission's finding that Capitoland did not terminate Sandoval's employment on February 16, 2015. Indeed, there is no support in the record for a contrary conclusion. Sandoval did not testify that Van Rossum explicitly told her she was fired. On the other hand, Van Rossum specifically testified that she did not tell Sandoval that she was fired, and Van Rossum and Sandoval both testified that Van Rossum specifically asked Sandoval to come back the following day. Van Rossum testified that she did not want to terminate Sandoval's employment because she liked Sandoval and believed that she was a good employee, and Van Rossum hoped that after learning more about Sandoval's living arrangement, they could work something out. Consistent with this evidence, Pastor Stauffacher testified that Van Rossum did not have authority to fire anyone without his prior approval, and that he did not give Van Rossum authority to fire Sandoval.

¶29 Sandoval disputes the Commission's finding, and she argues that, consistent with her testimony at the hearing, the result of the February 16 conversation with Van Rossum was clear to her—she "was already fired" and "couldn't go back to work" because she was living with someone of the opposite sex. The Commission reasonably concluded that Sandoval's "beliefs and perceptions" about the effect of "the conversation that occurred on February 16, 2015, are not evidence" about what actually transpired during that conversation. Substantial evidence, including the testimony of Van Rossum, Stauffacher, and Sandoval herself support the Commission's finding that Capitoland did not terminate Sandoval's employment on February 16, 2015.

¶30 We next conclude that substantial evidence supports the Commission's finding that Sandoval resigned from her position. Van Rossum testified (and Sandoval does not dispute) that, on February 16, after Van Rossum informed Sandoval of the violation and indicated she wanted to talk about it, Sandoval responded to the effect of, "That's okay, I'll be done." Van Rossum further testified that Sandoval stated that the next day would be her last day at Capitoland. And, although the parties agreed that Sandoval would return to work on February 17, she called in that morning to say she would not be coming to work; she did not call in or come to work on February 18, 19, and 20; and she only returned to the building on February 20 to drop off her key card. The Commission reasonably credited Van Rossum's assessment of these undisputed facts and her conclusion that Sandoval had resigned.

¶31 We further conclude that substantial evidence supports the Commission's finding that Sandoval's resignation did not amount to a constructive discharge. The doctrine of constructive discharge recognizes that "some resignations are, in fact, involuntary," and as such they are "tantamount to a termination." *Strozinsky*, 237 Wis. 2d 19, ¶¶6, 68. A constructive discharge occurs when an employer "'purposefully creates working conditions that are so intolerable that the employee has no option but to resign.'" *Id.*, ¶70 (quoted source omitted). To prove a constructive discharge, the employee must satisfy a "stringent" burden to prove that, under an "objective standard," working conditions were "so intolerable that a reasonable person confronted with the same circumstances would have been compelled to resign." *Id.*, ¶83.

¶32 We agree with the Commission that Sandoval did not satisfy her burden with regard to any of her working conditions prior to February 16, 2015.

The parties agree that by all accounts, Sandoval enjoyed working at Capitoland and Capitoland enjoyed having her as an employee.

¶33   Sandoval's theory of constructive discharge focuses exclusively on the events of February 16, 2015. She characterizes her conversation with Van Rossum as being presented with an "intolerable ultimatum"—that is, "marry your partner, dissolve your household, or lose your job." Essentially, Sandoval's argument is that, because she believed the ultimate consequence of her living condition would lead to termination from Capitoland, she was constructively discharged.

¶34   To be sure, there are circumstances in which an ultimatum might result in a constructive discharge. In *Stewart v. Gates*, 786 F. Supp. 2d 155, 168 (D.D.C. 2011), for example, a discriminatory ultimatum requiring a civilian employee to either resign or be transferred into an active war zone could constitute a constructive discharge. To provide another example, "[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill*., 219 F.3d 649, 655 (7th Cir. 2000). *See also Marten Transport, Ltd. v. DILHR*, 176 Wis. 2d 1012, 501 N.W.2d 391 (1993).

¶35   Here, however, the Commission found that the discussion about Sandoval's noncompliance with the Agreement was ongoing, that Capitoland had not yet imposed any ultimatum on Sandoval, and that the "conversation that occurred between [Sandoval] and Van Rossum [on February 16] does not equate to a constructive discharge." As mentioned above, Van Rossum testified that she

told Sandoval, "I don't want you to just make a decision now. It's something I'd like to talk about, and then I can touch base with Pastor Jake [Stauffacher], and we can go from there." And Stauffacher testified that an employee is not immediately terminated when found to be in violation of the Agreement, but rather, Capitoland attempts to work with the employee to find a solution.[7] As the Commission explained, it was "not at all clear … that the parties would have been able to find a mutually acceptable resolution to the conflict between [the Agreement] and [Sandoval's] belief that her living arrangement was not a matter of concern to [Capitoland]." However, "[Sandoval's] action in not returning to work in the days after the [February 16] meeting with Van Rossum truncated any opportunity for compromise."

¶36    Under our standard of review, we will sustain the Commission's findings if they are supported by substantial evidence in the record. For the reasons stated above, we affirm the Commission's finding that Sandoval voluntarily resigned her employment with Capitoland.

## II.  Exclusion of the Recording

¶37    Sandoval next argues that the hearing examiner erred when it did not allow her to admit the audio recording of the conversation between Van Rossum and Sandoval that occurred on February 20, 2015, when Sandoval returned to Capitoland to turn in her key card. Sandoval frames this issue as a question of whether her due process rights were violated; however, the underlying question is

---

[7] Indeed, there was evidence introduced at the hearing that Capitoland had been able to come to a mutually agreeable solution with another employee who shared living quarters with his significant other (to whom he was not married) and other family members.

13

whether the hearing examiner properly excluded evidence from the hearing. The decision to admit or exclude evidence is typically a matter within the administrative agency's discretion. ***Board of Regents of the Univ. of Wis. Sys. v. State of Wis. Pers. Comm'n***, 2002 WI 79, ¶26, 254 Wis. 2d 148, 646 N.W.2d 759. We conclude that the hearing examiner did not erroneously exercise his discretion.

¶38 We begin with some additional background on this issue. As stated above, Sandoval testified that, during the February 20, 2015 conversation, Van Rossum "told me that I could not return to work unless I got married, and if I didn't, I could not return to work." Van Rossum did not dispute Sandoval's account of the conversation in any meaningful way. Sandoval testified that she recorded her conversation with Van Rossum so that she could get a "sound bite" that would support a claim that she had been terminated based on her marital status, and that she "intentionally focused [the conversation] on the issue of marriage" when she spoke with Van Rossum on that date.

¶39 Sandoval's attorney asked to play the recording at two different points during the hearing. He first asked to play the recording right before Sandoval was about to testify about the February 20 conversation on the grounds that the recording would "jog" Sandoval's memory. After the hearing examiner sustained an objection and Sandoval testified about her memory of the event in her "own words," her attorney again sought to admit the recording as "proof" of the accuracy of Sandoval's testimony. The hearing examiner did not specifically weigh in on that request, and the parties moved on.

¶40 We are not persuaded that the hearing examiner erroneously exercised his discretion when he did not allow Sandoval's attorney to play the recording during the hearing. *See* WIS. STAT. § 227.45(1) (providing that a

14

hearing examiner shall admit all testimony having reasonable probative value, but shall exclude immaterial, irrelevant or unduly repetitious testimony).[8] Sandoval's attorney suggested that he wanted to refresh Sandoval's memory, but there was no need to do so because Sandoval did not appear to have any trouble recalling the contents of her conversation with Van Rossum. Nor was the recording needed as "proof" of the contents of the conversation—as stated above, Van Rossum did not dispute Sandoval's testimony about what she said that day.

¶41    Sandoval's attorney did not ask to play the recording for any purpose other than to refresh Sandoval's memory or as proof of the accuracy of her testimony. If Sandoval now contends that it would have been admissible for some other purpose, Sandoval has forfeited that argument. We generally do not address issues that an appellant raises for the first time on appeal. *Greene v. Hahn*, 2004 WI App 214, ¶21, 277 Wis. 2d 473, 689 N.W.2d 657.[9]

---

[8] *See* Rules of the Equal Opportunities Commission § 9.221 (dated September 9, 2021), available at https://www.cityofmadison.com/civil-rights/documents/RulesoftheEOC.pdf (providing that "[t]he rules of evidence governing hearings under this subsection shall be the same as those prescribed for hearings in contested cases under Chapter 227 of the Wisconsin Statutes").

[9] Despite our conclusion on forfeiture, we observe that Sandoval has not shown that the result of the proceeding would have been any different had the hearing examiner allowed Sandoval's counsel to play the recording. This is the case for two reasons. First, it appears that the Commission credited Sandoval's undisputed testimony about what was said on February 20, 2015. Sandoval does not contend that Van Rossum said that Capitoland terminated Sandoval's employment, and Sandoval's account of the contents of the conversation on February 20 was not otherwise material to the Commission's ultimate determination that Sandoval resigned her employment several days prior to that date. Second, there is no basis in the record to conclude that the recording would have undermined that ultimate determination. Sandoval's attorney did not ask to make an offer of proof about what the recording would have shown. Although the recording was not admitted during the hearing, we have reviewed a transcript of the recording that was submitted as a potential exhibit prior to the hearing and see nothing that would have altered the Commission's determination about Sandoval's resignation.

### III. Alleged Illegality of the Agreement's No Cohabitation Clause

¶42 Sandoval argues that, whether or not Capitoland terminated her employment, the Agreement's no cohabitation clause violates two subsections of the Equal Opportunities Ordinance. Specifically, she argues that the no cohabitation clause is a "term or condition" of employment that violates § 39.03(8)(a)[10] and a "statement of preference" that violates § 39.03(8)(e).[11] For reasons we now explain, Sandoval does not persuade us that it was legally erroneous for the Commission to reject these arguments.

¶43 First, as to the argument that the provision violates WIS. STAT. § 39.03(8)(e) of the Equal Opportunities Ordinance, we agree with the Commission that Capitoland did not receive pre-hearing notice that Sandoval was making an argument under that subsection. Prior to the hearing, the hearing examiner held a pre-hearing conference and issued a notice of hearing. As the Commission explained, "[o]ne of the purposes" of that process "is for the parties to come to an agreement and understanding of the issues to be tried." The notice of hearing indicated that Sandoval was challenging the Agreement's no cohabitation clause as an illegal term and condition of employment, but it did not

---

[10] Section 39.03(8)(a) of the Equal Opportunities Ordinance provides that it is unlawful for "any person or employer individually or in concert with others to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her/his compensation, terms, conditions, or privileges of employment, because of such individual's protected class membership [or other enumerated reasons]." MADISON, WIS., ORDINANCES § 39.03(8)(a).

[11] Section 39.03(8)(e) of the Equal Opportunities Ordinance provides that, subject to an exception not applicable here, it is unlawful for "any person or employer … to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer …, or relating to any classification …, indicating any preference, limitation, specification, or discrimination, based on any protected class membership [or other enumerated reasons]." MADISON, WIS., ORDINANCES § 39.03(8)(e).

mention that Sandoval was challenging the clause as an illegal statement of preference. As the Commission explained, "[a] claim of 'terms and conditions' discrimination is substantially different from the type of per se prohibition found in" § 39.03(8)(e).

¶44 Second, regardless of the merits of Sandoval's argument that the Agreement's cohabitation clause violates the Equal Opportunities Ordinance, Sandoval does not argue that she is entitled to relief if she voluntarily resigned her employment. During the proceedings before the Commission, Sandoval sought back pay, front pay, and an unspecified amount of damages for emotional distress, but it appears that some if not all of the damages sought by Sandoval may be dependent on proof that she was subjected to an adverse employment action. *See, e.g.*, **Marten Transport, Ltd.**, 176 Wis. 2d at 1018-20, 1025-26 (providing that an employee who had been subjected to illegal discrimination but who resigned his employment without being constructively discharged was not entitled to back pay and reinstatement). Regardless, Sandoval does not develop any argument explaining why she would be entitled to any of the damages she seeks if, as we have concluded, Capitoland did not terminate or constructively discharge her employment.[12]

---

[12] We observe that, even if Sandoval could overcome these barriers, she would face an additional significant barrier based on our supreme court's interpretation of an earlier version of the Equal Opportunities Ordinance. *See* **Federated Rural Elec. Ins. Co. v. Kessler**, 131 Wis. 2d 189, 388 N.W.2d 553 (1986). In **Kessler**, an employee challenged a work policy prohibiting employees from "fooling around" with any coworkers who were married. *Id.* at 195. Our supreme court determined that the policy regulated conduct not status, and that it was not discriminatory because it applied to married and unmarried employees alike. *Id.* at 208-09. Likewise, here, the Commission determined that the Capitoland policy prohibits all employees from engaging in the conduct of living with an individual of the opposite sex outside of marriage, and that the policy applies to married and unmarried individuals alike. Sandoval cites **Kessler** as if that case supports her position, but on its face, **Kessler** appears to support the Commission's decision.

## IV. The Christmas Party Claim

¶45    Finally, Sandoval argues that Capitoland unlawfully discriminated against her on the basis of marital status when it prevented her partner from attending the Christmas party.  As with Sandoval's argument that the Agreement is an illegal statement of preference, the Commission found that Sandoval did not provide pre-hearing notice that she was challenging the legality of its Christmas party attendance policy.  The Commission acknowledged that the statement of issues in the notice of hearing was "broad," but it noted that there was a "total absence of a claim regarding attendance at the Christmas party in January of 2015."  Therefore, it determined that Capitoland had no notice of "any potential liability connected to that claim."

¶46    Sandoval asserts that the Commission violated her due process rights when it declined to address the merits of this claim.  However, Sandoval cites no authority for the proposition that the Commission's decision implicates her due process rights.  As the Commission explained, "[o]ne of the fundamental underpinnings of due process is notice," and it is "imperative that a Respondent have notice of the claims against which it will be expected to defend itself."  We agree with the Commission that the due process issue here is whether Capitoland had sufficient notice of the claim.[13]

---

[13]  Neither party clearly informs us about the applicable standard of review for this issue. Through our own independent research, we have identified cases that address the concepts of actual notice and prejudice in other contexts.  In *E-Z Roll Off, LLC v. County of Oneida*, 2011 WI 71, ¶52, 335 Wis. 2d 720, 800 N.W.2d 421, for example, our supreme court has stated that actual notice and lack of prejudice are "intensive factual inquiries."  Therefore, we proceed by giving deference to the Commission's factual findings regarding notice and review de novo its determination of whether there is any due process violation.

¶47 Sandoval argues that the answer to this question is yes. She contends that Capitoland had actual notice of the claim, that Capitoland suffered no prejudice, and that the issue was fully briefed and there was a full hearing on the merits. Therefore, according to Sandoval, the Commission did not act according to law when it declined to issue a ruling on claims for which Capitoland had actual notice and that were "fully litigated."

¶48 We conclude that the Commission did not err when it determined that Capitoland did not have pre-hearing notice of any claim regarding its Christmas party attendance policy. Neither the complaint nor the amended complaint challenged this policy and, as stated above, the claim was not included in the notice of hearing. Although there was evidence introduced about the Christmas party during the hearing, this evidence appeared to have been introduced to provide background facts for how Capitoland learned that Sandoval was living with her partner in violation of its no cohabitation policy. Capitoland may have been able to hypothesize that Sandoval *might* challenge the legality of the Christmas party attendance policy, but she did not expressly do so until her post-hearing brief, at a time when evidence was closed. We agree with the Commission that, under the circumstances, Capitoland did not have a full and fair opportunity to develop the record to defend against that claim.

## CONCLUSION

¶49    For the reasons stated above, we conclude that the Commission did not erroneously deny Sandoval's employment discrimination claims.[14]

*By the Court.*—Order affirmed.

This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[14] Capitoland and Sandoval both make arguments about a potential conflict between Sandoval's right to be free from discrimination in her employment and Capitoland's First Amendment rights.  Based on our analysis above, we need not address these issues.  *See Barland v. Eau Claire Cnty.*, 216 Wis. 2d 560, 566 n. 2, 575 N.W.2d 691 (1998) (providing the general rule that the court of appeals decides cases on the narrowest grounds available).